**UNITED STATES of America,
Appellee,**

v.

**Charles R. HARARY, Appellant.**

**No. 430, Docket 71–1933.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 13, 1972.

Decided Feb. 28, 1972.

---

See also D.C., 329 F.Supp. 1404.

Michael S. Fawer, New Orleans, La. (Paul Bender, New York City, of counsel), for defendant-appellant.

Walter M. Phillips, Jr., Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Richard J. Davis, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MEDINA, KAUFMAN and TIMBERS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We must decide whether under certain circumstances and upon timely motion, a defendant has the right to have a lesser-included offense, although charged as a separate count in the indictment, withheld from the jury's consideration when the jury rationally cannot return a verdict of not guilty of the greater offense but guilty of the lesser offense.

Charles Harary appeals from a judgment of conviction for giving a gratuity to an Internal Revenue Agent in violation of 18 U.S.C. § 201(f), after a second jury trial before Judge Metzner. Harary, who was charged in a three-count indictment with conspiracy, 18 U.S.C. § 371, bribery, 18 U.S.C. § 201(b) (2), and giving a gratuity, argues that the trial judge erred in submitting the gratuity count to the jury. Harary was acquitted on the bribery and conspiracy counts. For the reasons we shall set forth, we remand to the district court with instructions to dismiss the indictment.

A detailed statement of facts will aid in clarifying the difficult issue we are called upon to resolve. In early August, 1970, Harold Wenig, an Inspector with the security branch of the Internal Rev-

enue Service, received information that two brothers, Meyer and Abraham Sutton, were so-called "payoff people." Thereupon, he arranged for Agent Lawrence Ostrow to audit the corporate tax returns for the years 1967 and 1968 of Sutton & Sutton, Ltd., an importer of ready-made wearing apparel owned by the Suttons. Ostrow, who previously had conducted audits for Wenig in instances where a bribery attempt was suspected, first met with defendant Harary, the Suttons' accountant, on September 1, 1970. At this initial meeting he questioned the source of the corporation's $199,000 capitalization.[1] Harary explained that the money came from the liquidation of a family estate in Syria, but was unable to produce any substantiation at that time. Accordingly, a second meeting was scheduled for September 22.

While at lunch on September 1, Harary casually asked Ostrow if he was interested in the prostitutes they had encountered on their way to lunch. Ostrow quickly expressed his disinterest, even when Harary stated he would pay the cost. Finally, over drinks at the termination of the meeting that day, Harary offered to give Ostrow a Yashica camera valued at more than $200. Although Ostrow declined this offer too, Harary unsuccessfully persisted, stating he would be ready to sell Ostrow the camera for $15 which, he added with a chuckle, was its cost.[2]

Ostrow immediately informed Wenig of these early overtures. When Ostrow returned for the September 22 meeting with Harary to continue what Wenig termed a "normal audit," he was outfitted with a concealed tape recorder. The capitalization figure continued to be the focus of their discussion. Ostrow stated that he was not satisfied with three letters Harary had produced which recounted the liquidation of the estate of the Suttons' father when he fled from Syria to Israel.[3] Instead, Ostrow demanded either a cancelled check or an affidavit to substantiate the Suttons' contention. At this point Meyer Sutton was asked to join the conference. He explained how difficult it would be to obtain the corroboration requested and pleaded with Ostrow to reconsider his demand. Ostrow said it would "put him out on a limb" if he agreed to waive his demand. The conference with Sutton ended with a warning from Ostrow that he would have to look into the Suttons' personal returns if the substantiation was not forthcoming because the large cash transactions in the businesses operated by the Suttons might furnish some light on the source of the capital.

After lunch on the 22nd, the capitalization item was discussed again. Although Ostrow repeatedly had set forth the substantiation he required, Harary pressed Ostrow with the Suttons' desire to have him conclude that the capitalization was satisfactory and suggested compensating Ostrow in return. It was then that Ostrow indicated his interest in a bribe by asking Harary: "What do you want me to do?" The two talked briefly about the capitalization and the requisite substantiation, and Harary became more explicit: "Maybe we can compensate you with some women or

---

1. No question was raised over the propriety of the capitalization figure, which could not affect the corporation's taxes. Ostrow, however, intimated that he would recommend that a tax deficiency be assessed against the Suttons personally unless they could substantiate that the $199,000 came from a nontaxable source or from taxable income properly reported.

2. Harary brought the camera from the Sutton offices in a brown paper bag. He explained that Al Sutton had taken it from one of their stores.

3. The first letter indicated that the writer was unable to accomplish the liquidation. The two other letters were written by one Jack Nasser, counsel to the Republic of the Philippines in Israel. He explained the difficulties and large costs of liquidating the estate in Syria which had been left when the senior Sutton was forced to flee to Israel, and indicated that he was forwarding the residue of approximately $200,000.

some money." "What do you want me to do," Ostrow repeated. When Harary proposed again that Ostrow should avoid questioning the capitalization item in his report, Ostrow responded: "Keep talking." Harary then made an initial offer of $250. Ostrow indicated that he was not satisfied with just this nibble and, by repeatedly responding "to keep talking as to anything else you want me to do," induced Harary to raise his offer to $1250 before Ostrow agreed to accept that sum. Ostrow was paid in cash that afternoon.[4]

Wenig arrested Harary one week later and brought him before two Assistant United States Attorneys for questioning. He was properly advised of his rights, initially declined to call his attorney and quickly admitted that he had paid the "bribe." Upon reconsidering, Harary decided to consult with his attorney. After conferring with counsel and in his presence, he again admitted to the Assistant United States Attorneys that he indeed had paid a "bribe" and added that he had made the initial overture. He and the Suttons, according to his statement, had decided after the September 1 meeting that Ostrow was "approachable."

The three-count indictment followed, based on payment of the $1250.[5] As we already have indicated, Harary was tried twice, the first trial having resulted in a mistrial. Both trials followed

virtually the same course. The government's case consisted solely of the uncontradicted testimony of Ostrow and Wenig establishing the facts to which we have alluded. Harary relied essentially on the cross-examination of the prosecution witnesses to establish his sole defense—entrapment—although three character witnesses testified on his behalf. The summation by both the prosecution and the defense centered on the issue of entrapment. At the first trial, denying Harary's motion to withhold the gratuity count from the jury, Judge Metzner instructed the jury on all three counts as well as on the defense of entrapment. In actuality, however, the gratuity count was considered as a lesser-included offense of bribery and not as a separate count since Judge Metzner instructed that the jury should consider the gratuity count only if it found Harary not guilty of bribery.[6] After twice returning to have the charge on entrapment read (and finally taking a copy of the charge to the jury room), the foreman announced at the end of two days of deliberations that the jurors could not reach a verdict. At the second trial, Harary continued the strategy he had employed at the first trial and repeatedly moved to strike the gratuity count,[7] but Judge Metzner denied those motions and instructed the jury on this issue as he had at the first trial. This time, however, the jury returned a verdict of not guilty on the conspiracy and

4. Harary actually told the Suttons that Ostrow would not agree unless he was paid $2000. Harary kept $750 for himself.

5. The Suttons also were named as defendants in the indictment. At the request of the government, Harary's trial was severed. Co-defendants Meyer and Abraham Sutton went to trial on October 6, 1971. A directed verdict of acquittal was granted as to Abraham and Meyer was convicted of bribery and sentenced to imprisonment for one year.

6. Both parties agree that the offense of giving a gratuity, as defined in 18 U.S.C. § 201(f), is a lesser-included offense of

bribery, as defined in 18 U.S.C. § 201 (b) (2). A lesser-included offense is commonly defined as one which is established by proof of all or less than all of the facts required to establish the greater offense. In short, it is of a kind in which one cannot commit the greater offense without committing the lesser offense. See 8 Moore, Federal Practice § 31.03 [2] and authorities cited therein.

7. Harary made the motion at the outset of the trial and renewed it at the end of the government's case and the close of the evidence. He moved for a judgment of acquittal after the verdict was returned.

bribery counts but guilty on the gratuity count.[8]

In the main, Harary argues that Sansone v. United States, 380 U.S. 343, 349–350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965), requires reversal of the conviction. The Supreme Court instructed in *Sansone* that a defendant does not have an absolute right to a lesser-included offense charge unless there is a "disputed factual element" which would allow the jury rationally to conclude that the defendant is guilty of the lesser offense, but not the greater offense:

> But a lesser-offense charge is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to both the lesser and greater offenses. . . . In other words, the lesser offense must be included within but not, on the facts of the case, be completely encompassed by the greater. A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense. (Citations omitted.)

*See also* Berra v. United States, 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013 (1956); Sparf v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895). Harary urges that this principle binds the government as well as the defendant, and that it is of no significance that the lesser-included offense is charged as a separate count of the indictment.

## I.

The threshold question, therefore, is whether the evidence adduced at trial presented the *disputed* factual element which *Sansone* decided would require a lesser-offense instruction. Bribery is defined by 18 U.S.C. § 201(b) (2) to include giving a public official anything of value *with the intent to influence him* to commit a fraud on the United States.[9] The lesser offense, giving a gratuity, is defined in § 201(f) to include giving a public official anything of value "for or because of any official act performed or to be performed" by him.[10] The only element which distinguishes bribery from giving a gratuity is *the specific intent to influence* which is required for conviction of bribery. *See* United States v. Umans, 368 F.2d 725, 728–730 (2d

---

8. At the second trial the jury returned once for a rereading of the entrapment charge, although it returned a second time to request Judge Metzner to repeat the charge on each count of the indictment and a third time to hear once more the charge on giving a gratuity.

9. 18 U.S.C. § 201(b) (2) provides:
   (b) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other persons or entity, with intent—
   \*  \*  \*  \*  \*  \*
   (2) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud or make opportunity for the commission of any fraud, on the United States;
   \*  \*  \*  \*  \*

Shall be fined not more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

10. 18 U.S.C. § 201(f) provides:
    (f) Whoever, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official . . .
    Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

Cir. 1966), cert. dismissed as improvidently granted, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967). Based upon a careful examination of the record, it is clear that this issue was not disputed in this case.

Putting aside for the moment the defense of entrapment, we observe that the element of specific intent was not contested by the appellant and was established perforce by Harary's extrajudicial admissions to which Wenig testified. Although it is true that when Harary admitted he paid a "bribe," he did not have the language of the statute in his hand, Harary's counsel was present. Moreover, the following testimony by Inspector Wenig to Harary's corrupt intentions as expressed by Harary in his counsel's presence indicates beyond a shadow of a doubt that he had intended to influence Ostrow and believed that the payment of money was the way to achieve it:

"A. He [the Assistant United States Attorney] first asked Mr. Harary did he pay a $1,250 bribe to Revenue Agent Lawrence Ostrow and Mr. Harary said 'Yes' and then Mr. Harary was asked who was instrumental in pushing this bribe and Mr. Harary stated that the Sutton Brothers were behind it and they had asked Mr. Harary, that is, the Sutton Brothers had asked Mr. Harary to close the deal and then he was asked why was the bribe paid and Mr. Harary stated that he was giving the Sutton Brothers a blow-by-blow description of what the Revenue Agent was doing during the examination and when the Revenue Agent told Mr. Harary that there could be a possible tax assessment of $60,000, he had communicated this fact to the Suttons and Mr. Harary said, since people don't like trouble and if the agent looks long enough he is going to find something wrong, they had decided to pay him.

And Mr. Harary then stated that he and the Suttons felt that after the initial meeting with Revenue Agent Ostrow on September first that the agent was approachable and that was the reason that they had tried this attempt.

Then Mr. Harary was asked who was the one that made the initial overture of the bribe; who was the one that first offered the bribe, and Mr. Harary stated that he was the one that offered the bribe first and not the agent. The agent didn't make any pitch for a bribe; that he was the one. Then he was asked how much money did he ask the Suttons for to pay off the Revenue Agent and Harary stated that when he had spoken to the Suttons, he had told them that the Revenue Agent had agreed to accept $2,000 and when Mr. Sutton, Abe Sutton, had come back from the place where he had obtained this $2,000, he had given this money to Mr. Harary and Mr. Harary was asked if he kept any of that money for himself and he said 'Yes,' that he took $750 out of that $2,000 and kept it for himself, without telling the Suttons what he was doing and without telling the Revenue Agent."

Under these circumstances, it would tax credulity to conclude that the payment of $1250 (after earlier and lower offers had been rejected), in return for Ostrow's malfeasance, was anything but outright bribery.[11] Moreover, the auction bargaining between Ostrow and Ha-

---

11. We find it difficult to illustrate hypothetical situations where money given during the course of an audit or other government examination will be given without the intent required for a bribery conviction. The offense of giving a gratuity was designed primarily to apply to situations where payment is not made until after official action is taken and the element of a corrupt bargain is absent or unprovable. See the Comment to § 1362 of the Proposed Federal Criminal Code of the National Commission on Reform of Federal Criminal Laws.

rary is totally incongruous with the concept of a gratuity.

It should be noted, contrary to the implications of the opinion of our dissenting brother, that it would not have been necessary for the jury to determine that something was "wrong" with the tax returns Ostrow was auditing before it could return a verdict of guilty on the bribery or conspiracy count. Certainly, money paid to an agent to induce him to terminate his audit is money paid with the intent to influence the performance of his official duties, even if the persons responsible for the payment are of the view that ultimately they will avoid any additional tax liability.

Furthermore, in light of Harary's admissions and his earlier offers relating to the prostitute and camera and the bargaining over the amount of money to be paid Ostrow, there is no basis for our brother's fanciful hypothesis that the jury reasonably could have concluded that Harary was as pure as fresh driven snow on the bribe and that he had no desire or intention whatsoever to corruptly influence Ostrow. We are asked to accept the intriguing thought that in participating in the scheme which ended in Ostrow being paid $1250, Harary's sole purpose was to secure a $750 "fee" for himself. Our able brother does not point to any support in the record for this resourceful thesis. The record we have examined is barren indeed of any basis for such a theory. Instead, it clearly indicates that from the outset Harary's compelling and primary motive was to influence Ostrow in his official position and thus secure Ostrow's good will on behalf of his clients. Although at some point Harary decided to share the spoils, this hardly negated Harary's clear and overriding intent to bribe Ostrow. Rather, it reinforced his desire that the bribe be paid. Surely, the dissent cannot be suggesting that an accountant's ability ruefully "to put one over" on clients who seek to bribe a government official will protect the accountant from a bribery prosecution. Finally, in rejecting our dissenting brother's in-

genious, but wholly unrealistic hypothesis, we rely not only on the evidence in the record, but the complete absence of the slightest suggestion by the defense at trial that it was relying on this figment to secure an acquittal. Indeed, it is not of little significance that the government has never seen fit even to suggest this argument to extricate itself from what proved to be misguided trial tactics. The dissenting opinion, which makes no mention of the first trial, seems to have rewritten the drama of the second trial to fit its own spellbinding scenario. Thus, it appears to be discussing a case which bears little resemblance to the one we are reviewing.

Intent, of course was an issue, as it always is in a bribery case, in the sense that the judge could not have directed a verdict for the government and the jury was free to disbelieve the testimony of Ostrow and Wenig. But, as Chief Judge Friendly stated the principle in United States v. Markis, 352 F.2d 860, 867 (2d Cir. 1965), vacated on other grounds, 387 U.S. 425, 87 S.Ct. 1709, 18 L.Ed.2d 864 (1967): "The mere fact that the jury was still free to disbelieve this portion of the agent's testimony [as to extrajudicial admissions neither attacked nor contradicted] does not elevate the issue to a truly 'disputed' one; in the language of the Model Penal Code § 1.-07(5) (1962), it does not provide 'a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.'"

Thus, if the court can conclude on the basis of the evidence presented that no reasonable man, weighing solely the evidence in light of the applicable law, could find the defendant guilty of the lesser offense and at the same time not guilty of the greater offense, no disputed factual element could be present which would compel the court to give the lesser-included offense instruction.

But, the government argues that the jury might have decided Harary did intend to influence Ostrow in his conduct of the audit, and that he was entrapped.

The jury could thus find him not guilty of bribery. The difficulty with this explanation of the jury's verdict on the bribery count is that it does not afford any rational basis for the gratuity conviction. In fact, we can see no justification whatsoever for concluding on the facts presented to us that Harary could have been entrapped into giving a bribe, but not into giving a gratuity. If he was ready and willing to commit one offense, it is only logical in the circumstances before us that he would have been ready and willing to commit the other.

## II.

■ The remaining question, specifically left open by this Court in United States v. Magnus, 365 F.2d 1007, 1010–1011 (2d Cir. 1966), cert. denied, 386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 783 (1967), is whether the *Sansone* holding applies to the prosecution as well as the defense. The policies which underlie *Sansone*, the culmination of a line of decisions dating back to 1895, can lead to only one conclusion: the prosecution cannot go to the jury, over the objection of the defendant, on both the lesser and the greater offense unless an element which distinguishes the two is disputed. *See* 8 Moore, Federal Practice ¶ 31.03 [3], at 31–20, 21 n. 35; *Cf.* United States ex rel. Hall v. Casscles, 321 F. Supp. 673 (S.D.N.Y.1971).

■ Rule 31(c) of the Federal Rules of Criminal Procedure provides that a "defendant may be found guilty of an offense necessarily included in the offense charged." This rule, which carries forward § 9 of the Act of June 1, 1872, 17 Stat. 198, was designed initially to aid the prosecution when its evidence fell short of proving the offense charged in the indictment. *See* United States v. Markis, 352 F.2d at 866; Kelly v. United States, 125 U.S.App.D.C. 205, 370 F.2d 227, 229 (1966), cert. denied, 388 U.S. 913, 87 S.Ct. 2127, 18 L.Ed.2d 1355 (1967); 8 Moore, Federal Practice ¶ 31.03[1]. In appropriate cases, however, the defense may avail itself of the

rule. Stevenson v. United States, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); United States v. Markis, 352 F.2d at 866.

The proper case is one where "the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense. The jury is not given *carte blanche* to find the defendant guilty of only the lesser offense when such guilt necessarily establishes guilt of the greater offense." Fuller v. United States, 132 U.S.App.D.C. 264, 407 F.2d 1199, 1229 (1968) (*en banc*), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969). If there is no factual dispute concerning an element which distinguishes the offenses, to instruct on both offenses "would only invite the jury to pick between the [greater and lesser] so as to determine the punishment to be imposed, a duty Congress has traditionally left to the judge." Sansone v. United States, 380 U.S. at 350 n. 6, 85 S.Ct. at 1009; *see* Berra v. United States, 351 U.S. at 135, 76 S.Ct. 685; Sparf v. United States, 156 U.S. at 63–64, 15 S.Ct. 273. Although the jury has the power to render a verdict "in the teeth of both law and facts," Horning v. District of Columbia, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185 (1920), a judge should not instruct a jury on a lesser offense over the objection of the prosecution or defense, if that instruction serves only to encourage the jury to exceed its historical function of factfinding. As the late Justice Harlan stated: "The role of the jury in a federal criminal case is to decide only the issues of fact, taking the law as given by the court. Sparf v. United States, 156 U.S. 51, 102, [15 S.Ct. 273, 39 L.Ed. 343.] Certainly Rule 31(c) was never intended to change this traditional function of the jury." Berra v. United States, 351 U.S. at 134, 76 S.Ct. at 688.

■ The rationale of *Sansone*, to which we have made reference, recognizes that the jury, although the defendant is in fact guilty of the greater offense, may take the easier course by exercising its mercy-dispensing power and

return a guilty verdict on the lesser offense, thereby shirking its sworn duty. The underlying principle, however, applies equally when the prosecution seeks an instruction on the lesser offense. The jury, if it cannot agree on the basic issue of guilt, may seek the course of least resistance in the jury room and unjustly convict on the lesser offense instead of forthrightly acquitting. Those who have labored in the vineyard of litigation are aware that where the case is a hard one for the government, as this was, it will consider its task done if it can secure "the advantage of offering the jury a choice—a situation which is apt to induce a doubtful jury to find the defendant guilty of the less serious offense rather than to continue the debate . . . ." Cichos v. Indiana, 385 U.S. 76, 81, 87 S.Ct. 271, 274, 17 L.Ed.2d 175 (1966) (Fortas, J., dissenting). Harary's repeated motions to dismiss the gratuity count to avoid the inconsistent and compromise verdict which resulted exhibited a willingness to risk foregoing a sympathy verdict which could bring a maximum sentence of two years instead of fifteen years. His counsel's judgment was based on the fear, fully justified by the first trial, that the jury would not be able to agree on the issue of entrapment or the bribery count and thus resort to the easy way out.[12] Indeed, the jury must have encountered difficulty in agreeing on a verdict (as, in fact, the first trial illustrated), and reached common ground through a compromise. Otherwise, we cannot comprehend how, on the basis of the evidence we have already recited, it could find that the facts established the offense of giving a mere gratuity and not outright bribery.

■ The government, we are told, had an absolute right to have the jury charged on the gratuity offense because the indictment contained a separate gratuity count. The government, however, cannot avoid the strictures of the *Sansone* doctrine by the simple expedient of asking the grand jury to include the lesser offense as a separate count in the indictment. *See* Fuller v. United States, 407 F.2d at 1230.[13] A separate count serves little purpose in light of Rule 31 (c), which permits the court to charge the jury on a lesser offense in appropriate cases despite the absence of a separate count in the indictment.

So that the boundaries of our holding are clear, we emphasize that we do not consider it to be reversible error to submit a lesser charge to the jury unless no "disputed factual element" which distinguishes the offenses is present and, in addition, the defendant makes a timely motion or objection at the trial. *Cf.* Fuller v. United States, 407 F.2d at 1230–1231.

Since Harary cannot be retried on the greater offense because of his acquittal on that count, our only course is to re-

12. We are of the view that it will be a rare case indeed when a defendant will not want the advantage of a lesser-offense charge. For obvious reasons, the all-or-nothing risk which the defendant here was willing to take is an unusual strategy. We fully recognize, also, that compromise or inconsistent verdicts are not *per se* grounds for reversal. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); United States v. Magnus, 365 F.2d at 1010. This hardly leads to the conclusion, however, that in the face of vigorous objection a judge should give a charge that can only serve the purpose of inducing such verdicts.

13. The *Fuller* court stated:
　　In general the chargeability of lesser included offenses rests on a principle of mutuality, that if proper, a charge may be demanded by either the prosecution or defense. We see no reason why the prosecution should have an option unavailable to defendant, of being able to insist that the jury render a verdict on the lesser offense notwithstanding a verdict of guilty of the greater offense, and should be able to realize on that option by the simple technique of filing an indictment in two counts rather than one. (Footnotes omitted.)
　　Judge Burger, now Chief Justice of the United States, concurred in both the panel and *en banc* opinions.

mand to the district court with instructions to dismiss the indictment. Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). Although the evidence of guilt of bribery makes us reluctant to reverse the judgment of conviction on mere gratuity giving and we, too, find this saga of attempted corruption of a federal official "revolting," an appellate court can never be justified in a short-sighted preoccupation with shepherding the conviction of a defendant on a charge which has no valid basis on the evidence. We find it difficult to understand why our brother has proceeded on the totally irrelevant premise that "jurors are smarter than some people think they are," except that it indicates his view that the jury was wise in finding Harary guilty of something, even if it was the wrong thing. If this principle is valid then we see no useful purpose for judges. Our able brother's resourceful characterization of the record, while mesmerizing, only distracts from the difficult question of law to which he pays so little attention.

Reversed and remanded to the district court with instructions to dismiss the indictment.

MEDINA, Circuit Judge (dissenting):

Charles R. Harary, a Certified Public Accountant, appeals from a judgment entered upon the verdict of a jury, after a trial before Judge Metzner, convicting him of giving a gratuity to an Internal Revenue Agent in violation of 18 U.S.C., Section 201(f). The indictment charged Harary: in Count 1 with conspiracy to give a bribe; in Count 2 with giving a bribe with the specific corrupt intent to influence the Revenue Agent's audit of the income tax returns of Sutton & Sutton, Ltd., in violation of 18 U.S.C., Section 201(b); and in Count 3 with giving the Internal Revenue Agent a gratuity in violation of 18 U.S.C., Section 201(f). The jury acquitted Harary of conspiracy to bribe and of bribery but found him guilty of giving a gratuity. He was sentenced to a term of imprisonment for

1 year and is at large on bail pending the determination of this appeal.

I

The sole point raised is that the trial judge erred in denying defendant's motion to withdraw the gratuity count from the consideration of the jury. As this is a lesser-included offense and, as the jury was instructed, there could have been no verdict of guilty on both the bribery and the gratuity counts, and as the evidence was sufficient to support a verdict of guilty of bribery, Harary argues that the submission of the gratuity count was error because: "the evidence could only support a verdict of guilty of bribery or an acquittal by reason of entrapment"; the submission of the gratuity count was an invitation to bring in a compromise verdict, and "to invade that province traditionally left to the court—the imposition of punishment." If this argument prevails Harary, whose counsel admitted in his opening to the jury that Harary had paid $1250 to the Revenue Agent, will be a free man, protected by the verdict of acquittal on the conspiracy and bribery counts from further prosecution.

It is clear to me that there is no merit whatever in any of the arguments proffered on Harary's behalf. In this simple case the Government chose to allege in the indictment each of the three counts above referred to, the defendant pleaded not guilty to each count. This put in issue each and every material allegation set forth in each count. There was no occasion to sift the proofs to discover any dispute. This inquiry was pursued in Sansone v. United States, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965), and United States v. Markis, 352 F.2d 860 (2d Cir. 1965) so heavily relied upon by Harary, because the indictment in each of these cases did not allege or charge the commission of the lesser offense. In each of these cases it was found that the record showed no dispute, and hence no issue. The requested charge on the lesser-included of-

fense was accordingly denied. The lesser offense literally was not in the case. In our case the pleas of not guilty put in issue the allegations of the gratuity count as well as the others. Harary did not testify in his own defense. His proofs consisted of a few character witnesses. The vital difference between the bribery count and the gratuity count was that a verdict of guilty of bribery had to be based on a finding of a specific intent to influence an official act of the Revenue Agent, whereas no such finding was necessary to establish the payment of a gratuity. It was the sole function of the jury to find or not to find that Harary entertained the requisite specific intent alleged in the bribery count. And there was ample proof to support the verdict of guilty on the gratuity count.

The claim that Harary conceded and then "again conceded the factual elements supporting the bribery charge" is pure nonsense. This would have meant that he conceded he paid the money with the specific intent to influence a Revenue Agent in the performance of his duty. Counsel for Harary made no such concession, nor any concession other than that he paid the $1250 to the Revenue Agent. What counsel refers to is the testimony adduced by the prosecution of questions and answers of Harary in his statement to an Assistant United States Attorney shortly after his arrest.

## II

I think what has already been said is sufficient to demonstrate that the judgment should be affirmed. I shall review and discuss the evidence, however, because I am convinced that the jurors reached a proper and thoroughly sensible and rational conclusion with respect to every one of the three counts submitted to them. The instructions of the trial judge were in every respect accurate and free from confusion, ambiguity or repetition.

Sometime in August 1970 Inspector Harold Wenig, in charge of investigations of corruption on the part of Revenue Agents and taxpayers, received a tip from an informant that Sutton & Sutton, Ltd., which operated a series of retail cash discount stores, was making pay-offs to municipal employees. Consequently, he ordered the corporate tax returns sent to him at once and caused Revenue Agent Lawrence Ostrow, with whom the Inspector had worked before, to be assigned to make a "routine audit," although no such audit had been contemplated. The Inspector gave Ostrow the most explicit directions. He was free to eat and drink at the taxpayer's expense. He was, however, under no circumstances to initiate any discussion about making gifts or paying money. But if any "overtures" were made, he was to report them at once and then play for time until arrangements could be made to get the approval of the Attorney General to wire Ostrow for sound in order to record any offer that might be made following the "overtures." When it came down to money, if any was offered, he could bargain and induce the taxpayer to increase the offer so long as he was not the first one to bring up the subject.

It is amazing how quickly the business was done. Ostrow's first conference with Harary, and one or both of the Sutton Brothers, was on September 1, 1970 at the Suttons' place of business. The first of the two corporate tax returns was for an initial period of July 21 to August 31, 1967 for the purpose of establishing an accounting period. The second corporate tax return was for the period September 1, 1967 to August 31, 1968. After a few perfunctory inquiries concerning income items, expenses and inventory, Ostrow zeroed in on an item of $199,000 representing capitalization. Where did that money come from? By lunch time Ostrow and Harary were very chummy. They had lunch together. Harary offered Ostrow the services of a prostitute, free of charge, but Ostrow says he declined the offer. Nevertheless they went around to the place frequented by these prostitutes to look them over, but none was there. Harary also of-

fered a camera, free or at a large discount. Nothing came of this.

Most of the afternoon was spent discussing the item of $199,000. The Suttons said their father had very large holdings in Syria and Lebanon, that the $199,000 item represented what they were able to salvage, at great sacrifice, through the cooperation of certain Arabs. They produced letters, the most recent of which stated "we have succeeded in liquidating the estate and you are getting a small sum of the overall estate." But Ostrow said anyone might have written these letters. What he needed were affidavits, notarized in Syria or Lebanon. For an Arab to do this to help a Jew to get money of the country would be like committing suicide, Ostrow was told. Nothing satisfied him. The deposit slips showed the moneys came from abroad. But Ostrow had to see the cancelled checks, which were not obtainable.

So, after about 4 hours of so-called audit on September 1, 1970, Ostrow returned to Inspector Wenig with the good news that Harary had made the anticipated "overtures," meaning the offer of the services of a prostitute and the camera. Ostrow had arranged to have Harary bring him, on September 4, the individual tax returns of the two Suttons. This had to be called off so that arrangements for wiring Ostrow for sound could be completed before the meeting at which it was expected Harary would make an offer of money. A new conference for a continuance of the "audit" was set for September 22, 1970, also at the place of business of the Suttons. When the time came, the approval of the Attorney General having been obtained, Ostrow was "wired up" by placing a KEL transmitter about the size of a king-sized cigarette case on his person, so Inspector Wenig could listen to what occurred, and by placing a Miniform recorder in his briefcase to make a permanent record that could be played back. Ostrow was searched and found to have $19. Then the Inspector and Ostrow, and perhaps others, drove over to the

Suttons'. It turned out later that the recording was so full of inaudibles that it was not received in evidence at the trial. It was, however, used extensively on the cross-examination of Ostrow, which consumed the greater part of the trial.

On the morning of September 22 Ostrow pulled out all the stops. He doubted whether even the cancelled checks or affidavits by the Arabs would satisfy him. He told Harary and one of the Suttons that he had to be able to trace the flow of the funds from their source into the corporation. And he said twice that if they could not substantiate the item of $199,000 to his satisfaction, he would have to assess a tax of $60,000 against the two Suttons individually. The predictable result was that, after another lunch at the expense of the Suttons, Harary began to talk money. It was he who brought the subject up. True to his instructions, Ostrow told Harary to "keep talking." Starting at $250, Harary was soon up to $1000. At this point he told Ostrow confidentially that of the $1000, $750 would go to Ostrow and Harary would keep the other $250 himself. Finally, Ostrow was to get $1250. Harary told the Suttons that Ostrow wanted $2000. And when one of the Suttons brought $2000 in a brown paper bag, Harary gave $1250 to Ostrow and kept the other $750 for himself. It is a revolting story.

A few days later Harary was arrested. After being photographed and fingerprinted, he was taken to the office of the United States Attorney, given the Miranda warnings and interviewed. His attorney came over. Inspector Wenig and at least two Assistant United States Attorneys were there. One of them explained to Harary the advantage of cooperation. Inspector Wenig also told him that they had a good solid case against him and that "when somebody comes in and cooperates they certainly are given some sort of consideration by the court." Accordingly, after private discussion with his attorney, Harary gave the statement in question and an-

swer form that is so strongly relied on by counsel here as a "concession" that he was guilty of bribery as alleged in Count 2 of the indictment. This is supposed to leave only the issue of entrapment for the consideration of the jury in connection with the bribery count, despite the fact that the statute and the judge's instructions required a finding that the money was paid with a specific intent to influence Ostrow's audit of the income tax returns of Sutton & Sutton, Ltd.

Harary's statement, as testified by Wenig, was:

[Maloney] first asked Mr. Harary did he pay a $1250 bribe to Revenue Agent Lawrence Ostrow and Mr. Harary said "Yes" and then Mr. Harary was asked who was instrumental in pushing this bribe and Mr. Harary stated that the Sutton Brothers were behind it and they had asked Mr. Harary * * * to close the deal and then he was asked why was the bribe paid and Mr. Harary stated that he was giving the Sutton Brothers a blow-by-blow description of what the Revenue Agent was doing during the examination and when the Revenue Agent told Mr. Harary that there could be a possible tax assessment of $60,000, he had communicated this fact to the Suttons and Mr. Harary said, since people don't like trouble and if the agent looks long enough he is going to find something wrong, they had decided to pay him.

There is no doubt that the proofs would have supported a verdict of guilty of conspiracy to bribe as charged in Count 1, and a verdict of guilty of bribery as charged in Count 2. They could only have done this after rejecting the defense of entrapment, and such a rejection was justified by Ostrow's testimony that in the case of the offer of the free services of a prostitute and the camera, as well as in the case of the money, it was Harary who took the initiative. But counsel tells us there was no rational basis for an acquittal on the bribery count, and a finding of guilt on the gratuity count. Jurors are smarter than some people think they are. I believe the verdicts on each of the three counts were not only consistent with the proofs, but that they represent a very sensible and rational disposition of all the issues in the case.

Even if the jury believed that Harary made the statement attributed to him by Inspector Wenig, the statement was made in an obvious attempt to aid the Government in the prosecution of the Suttons. The jury was not obliged to believe that the Suttons told Harary or Harary told the Suttons that if the Agent looked long enough he would find something. The word "bribe" in the first question may have been thought by Harary merely to refer to the payment of the money, and not to include such a technical matter as a specific intent to cause the Agent to do an official act.

Despite the fact that the burden of the prosecutor's summation was to persuade the jury to find Harary guilty of bribery, and the burden of defense counsel's summation was to persuade the jury to acquit Harary because of entrapment, there were overtones that could scarcely have escaped the attention of the jury. Sometimes an argument by way of indirection is the most effective. Here, every word spoken by defense counsel in support of the defense of entrapment served also to convince the jury that the whole affair of the $199,000 item was pure stage play, and that Harary knew it was pure stage play to get the money. The way Ostrow acted from the first gave Harary the impression that he was looking for a hand-out. The rejection of the letters and the deposit slips, and the perfectly ridiculous statement by Ostrow that he would have to assess a tax of $60,000 against the Suttons individually unless he could be shown proof tracing the funds from their origin in Syria or Lebanon into the corporate bank account, was pure unadulterated hokum. Harary must have known that Ostrow had no authority to assess such a tax or to impose such impossible conditions. At least this might

well have been the reaction of the jury to Ostrow's fantastic procedure as he tried so hard to lay the trap for Harary. And, if the jury reasoned in this fashion, it seems not too much to suppose it also concluded that there was nothing wrong in the tax returns of Sutton & Sutton, Ltd., and no point in bribing Ostrow to do anything. On this theory, there was ample basis for a finding that the prosecution had not established, to the jury's satisfaction, that the money was paid with the specific intent to influence an official act by Ostrow. On this same theory, a verdict of not guilty on the conspiracy count was also rationally justified. It must be recalled that while the word "gratuity" appears in the conspiracy count, the allegation is solely of a conspiracy to bribe with the specific intent above referred to; and this is the interpretation of the conspiracy count adopted by the trial judge in his instructions to the jury.

Another equally rational basis for the verdict of acquittal on the bribery count is that the jury may have concluded that, whatever may have been the intent of the Suttons, whose case had been severed prior to the trial, the specific purpose and intent of Harary was not to induce the Revenue Agent to do any official act but rather to get the $750 he put in his own pocket.

It was the jury's function to decide whether the Government had proved, to its satisfaction beyond a reasonable doubt, that Harary, at the time he paid the $1250, entertained the specific intent to corruptly influence Ostrow to do an official act. As the trial judge instructed the jury:

> It is obviously impossible to ascertain or prove directly what a man knew or intended. You cannot look into a person's mind and see what his intentions were or what he knew. But a careful and intelligent consideration of the facts and circumstances shown by the evidence in any given case as to a person's actions and statements enables us to infer with a reasonable degree of certainty and accuracy what his intentions were in doing or not doing certain things and the state of his knowledge.

I find nothing in the record to indicate that the jury, at any time, concerned itself with any compromise or with the subject of the punishment to be meted out to Harary.

The jury was instructed to decide the bribery count first, and told that it could not turn to the lesser-included charge of gratuity until it had decided guilty or not guilty on the bribery count. And so, just before bringing in its verdict, the jury asked that the instructions on the subject of the gratuity count be read to it, and this was done. On the state of this record the verdict of guilty on the gratuity count was inevitable.

I think justice has been done in this case and respectfully dissent from the reversal of the judgment of conviction.