**UNITED STATES, Appellee,**

v.

**Tommy JACKSON, Private First Class, U.S. Army, Appellant.**

No. 39,516.
CM 438721.

U.S. Court of Military Appeals.

Dec. 14, 1981.

For Appellant: *Captain Paul J. Moriarty* (argued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Jerome E. Kelly Captain Courtney B. Wheeler* (on brief); *Major Charles A. Byler, Major Raymond C. Ruppert.*

For Appellee: *Captain Michael E. Pfau* (argued); *Colonel R.R. Boller, Major Ted B. Borek, Captain Paul G. Thompson, Captain Glenn D. Gillett* (on brief); *Major John T. Edwards, Captain Paul K. Cascio.*

Opinion of the Court

EVERETT, Chief Judge:

Contrary to his pleas, appellant was convicted by general court-martial of rape, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920, and was sentenced to a dishonorable discharge, confinement at hard labor for 7 years, forfeiture of $150 pay per month for 84 months, and reduction to the lowest enlisted grade. The convening authority approved these results and the United States Army Court of Military Review affirmed in an unpublished memorandum opinion.

This Court granted review (10 M.J. 29) to consider appellant's contention that "[t]he military judge erred by refusing a defense request" for instructions on lesser-included offenses of the charged rape. Under the circumstances of this case, we conclude that the instructions should have been given.

I

Appellant was alleged to have raped Specialist Rooney, who was billeted in the same barracks as appellant. Rooney testified that one night she and some others had been drinking beer for several hours, with the party ending in a friend's nearby room. After this friend had passed out from drinking about 2:00 a.m., Rooney returned to her own room. Upon arriving there, she undressed, talked to her roommate, Private Diggs, and got into bed wearing a T-shirt and underpants. Shortly thereafter, Specialist Petty came into the room and borrowed a bottle of gin from Diggs and, at the request of Rooney, turned off the light as he left. When he told Rooney she should lock her door, Rooney replied that she was waiting for someone. Rooney then, by her own account, passed out drunk. The testimony of Diggs supported this scenario.

About one half hour later Rooney was awakened by a man lying on top of her, kissing her, and trying to have sexual intercourse with her. She testified at trial that he had penetrated her because she could feel the pain of his penetration when she awoke. She shouted at him to get off her and out of her room, kicking and hitting him all along. As the intruder left, she recognized him as appellant. Rooney jumped from the bed, pulled on her pants, and chased him down the hall to the shower room. At the door there she stood shouting at appellant to come out and calling him names. Finally, appellant exited and Rooney, still shouting at him, hauled Jackson toward the desk of the Charge of Quarters (CQ). However, before reaching the CQ, appellant escaped Rooney's control. A short time later, he was recaptured while trying to climb into his own window from outside the barracks building.

At trial defense counsel contended that appellant had never accomplished penetration of Rooney and so was not guilty of rape. This theory of defense was signaled in the opening statement of the individual defense counsel to the members, wherein he made clear that the defense did not intend to attack Rooney's truthfulness—only her ability while highly intoxicated to perceive correctly whether she had been penetrated. Counsel indicated to the members that the evidence would reflect certain important factors for them to consider as to this ability, as well as several factors suggesting that penetration had not occurred. Among the circumstances to which he adverted were Rooney's drunken condition, which culminated in her passing out; her being awakened from a drunken state of heavy sleep within a short period of time; her wearing of her underpants throughout the incident; her menstruation at this time; and her making a statement to the CQ, Specialist Bush, immediately after the incident in which she did not indicate that the rape had been consummated.

The defense sought to make its case primarily through cross-examination of Rooney and through direct examination of Specialist Bush as a defense witness. While defense counsel was unable to shake Rooney's testimony that she had been aware of what happened to her and that she had been penetrated—evidenced to her by the pain she felt by the penetration upon being awakened—counsel did obtain her concessions that she was indeed drunk when she passed out in her bed and that generally her perceptions are not very good upon being suddenly awakened from such a deep sleep. In line with the defense theory that Rooney had misperceived the fact of penetration, she testified that evidently her underpants had remained on throughout the attack. Moreover, the defense established that Rooney at the time had been experiencing her monthly menstrual period and that she had a tampon in place when she went to bed, although she also testified that the tampon was on the floor next to her bed when she returned to her room shortly after seeing the CQ, Specialist Bush.

Called as a defense witness after the prosecution had rested, Bush testified that when Rooney came to him immediately after the attack, she told him that she had gone to her room after leaving her friend's and that the lights were out when she entered. She then got into her bed only to find a body already there—someone whom she did not know. She fought to keep the person away from her and succeeded—the person got up and left the room, followed by her in pursuit down the hall. Bush testified that Rooney led him to believe that a man nicknamed "Porkey" had slept with her on previous occasions and that she had initially thought he was in her bed that night. Indeed, it had taken her a few seconds to realize that her companion was not "Porkey." Bush explained that he could have misunderstood Rooney because she was extremely upset; but that his testimony conformed to his understanding of what she had said. In response to a defense question specifically addressing whether Rooney had claimed she had been raped, Bush testified:

Right, all she told me, that she was, you know, sexually confronted. He, you know, he tried to, you know, have intercourse with her, make the act, and that before it really got started she was up and pushing him off, trying to keep him away.

Only about two hours later, after she had calmed down somewhat, did she indicate to Bush that appellant had had intercourse with her.

At the conclusion of the evidence, the military judge and counsel discussed relevant instructions in an out-of-court session. When individual defense counsel asked for instructions on the lesser included offenses of attempted rape, indecent assault, assault and battery, and assault with intent to rape, trial counsel resisted. He contended that no evidence supported instructions on lesser included offenses, since the defense had never contested penetration by offering testimony that there had not been penetration. Defense counsel responded that Bush had revealed that Rooney initially had indicated that her assailant had attempted to have intercourse but had not succeeded.

At this point, the military judge called Bush into the out-of-court session to clarify his testimony about Rooney's first statement to him. The judge then elicited this testimony:

Q. She had told you both—that he had not succeeded and that he had succeeded. Is that what you're saying?

A. Right, right, so you know, I didn't know which one to believe, actually. It didn't really matter to me. The point was—the only thing I was concerned about was—was whether or not to call the MP's. That was it, it didn't really phase me a bit if he did or not, but I could tell that she was upset, you know, and something happened you know. I have no idea what it was, but something happened, just the way her emotions were, in an uproar.

Notwithstanding this clarification, the judge refused the instruction request. Noting that Bush's testimony merely revealed a prior inconsistent statement of Rooney's and, as such, could not be used for the truth of the matter asserted,[1] the judge concluded that only Rooney had given any evidence regarding penetration and her testimony in

---

1. It is not entirely clear whether this ruling is correct. Paragraph 153*b*(2)(c) of the Manual for Courts-Martial, United States, 1969 (Revised edition), permits the use of a prior inconsistent statement of a witness other than the accused to be used for the truth of the matter asserted if it is otherwise admissible as an exception to the hearsay rule. It is arguable that Rooney's first statement constituted fresh complaint of a sexual assault of some degree. *See* para. 142*c*, Manual, *supra.* In oral argument, the Government asserted that Rooney's first statement to Bush may not properly be used even as a prior inconsistent statement because the requisite foundation therefor was not laid by the defense. *See* para. 153*b*(2)(c), Manual, *supra*; Mil.R.Evid. 613(b). However, trial counsel never objected to any portion of Bush's testimony in this regard. Mil.R.Evid. 103(a)(1) recognizes this concept. Moreover, Rooney, the declarant, was in court as a witness and subject to cross-examination. *Cf. California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

that regard had not equivocated. Concerning the defense attack on the accuracy of Rooney's perceptions, the following comment by the judge illustrates his position:

Now [in] every case they could conclude the victim was wrong, and of course if they conclude it today, among other things, they probably at that point should be concluding that her whole story's fabricated or at least not convinced beyond a reasonable doubt that it's true and therefore they should acquit.

After the judge asked the defense to clarify its theory of the case, individual defense counsel responded:

Your Honor, the defense theory of the case is, that there was of course an unusual event in the room. We don't deny that. Now we certainly don't—we will not deny that Jackson was in her room. We will deny however and point to the inconsistencies in the girl's testimony that she really wasn't aware of what was going on at the very beginning. It was only later that it really hit that this is not Porkey in her room. This man shouldn't be in her room, she was in no condition to judge. She had been passed—she had passed out drunk anyway, to begin with, and then shortly thereafter awakened by this person in her room, according to her testimony today in court. One could well of concluded from that that she was still drowsy, disoriented, and in no condition in any event to realize what was happening. It's rather unlikely anyway, with her underclothes on, and that only later did she think that that must've been what had happened to her, because of what had happened in the room. There's no other explanation for the man being there. That he was raping her or trying to rape her. And so our theory will be that the inconsistencies in her testimony, simply do not prove beyond a reasonable doubt that a rape occurred. There were—possibly something else, which we have conceded on our opening remarks, and that's why we've tried to have the court instruct on lesser included offenses. We certainly don't to go [sic] into this case all or nothing. But that is the only

way to go in this case, in so far as the defense is concerned. The inconsistencies from the mouth of the complaining witness. Which are explainable, because of her condition at that time. We certainly don't suggest that she's a liar.

Even in the face of the judge's refusal to render instructions consistent with his theory of defense, Jackson's counsel pursued that theory right through his closing argument. The following excerpts from that presentation illustrate the point:

We are not suggesting that Rooney is a liar and totally poor of character. We're simply suggesting to you that she has given inconsistent versions explainably, because she simply was not aware of what was going on at the time. She drew certain conclusions later which were false. And then of course once she has drawn the conclusions and made her move, she has a certain vested interest in seeing the case through. That is the explanation.

\* \* \* \* \* \*

[W]e don't deny that Jackson was in her room.

\* \* \* \* \*. \*

Gentleman [sic], Lieutenant Martin, we cannot emphasize enough, that you do not have to conclude that Rooney is a liar, in order to conclude that she is mistaken, as to the actual fact of rape. We're not asking you to conclude that Rooney is a liar.

## II

█ It is a well-established principle of military law that the military judge must properly instruct members on all lesser included offenses reasonably raised by the evidence. Indeed, so important is this duty that it arises *sua sponte* under appropriate circumstances, even without a defense request. *United States v. Clark*, 22 U.S.C.M.A. 576, 48 C.M.R. 83 (1973). It is not necessary that the evidence which raises an issue be compelling or convincing beyond a reasonable doubt. *United States v. Jack-*

son, 6 M.J. 261, 263 n.3 (C.M.A.1979). *See United States v. Judd*, 11 U.S.C.M.A. 164, 28 C.M.R. 388 (1960). Instead, the instructional duty arises whenever "some evidence" is presented to which the fact finders might "attach credit if" they so desire. *United States v. Evans*, 17 U.S.C.M.A. 238, 242, 38 C.M.R. 36, 40 (1967).[2] As the Supreme Court put it in *Sansone v. United States*, 380 U.S. 343, 350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965):

> A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense.

By what means and from what source evidence is presented to raise a lesser included offense is immaterial.[3] In oral argument in this Court, the Government suggested that a split of authority exists in federal precedent as to whether lack of credibility alone is enough to raise a lesser included offense; indeed, government counsel urged that there must be some "substantive affirmative evidence" challenging an element of the charged offense before an issue of a lesser included offense is raised. In support, counsel cited to us our recent opinion in *United States v. Waldron*, 11 M.J. 36 (C.M.A.1981), and two federal court of appeals cases—*United States v. Harary*, 457 F.2d 471 (2nd Cir. 1972), and *Driscoll v. United States*, 356 F.2d 324 (1st Cir. 1966), *vacated on other grounds*, 390 U.S. 202, 88 S.Ct. 899, 19 L.Ed.2d 1034 (1968).

However, an examination of those cases indicates that they do not stand for the precise proposition for which the Government has cited them as authority. Of course, *Harary* does support the view that "[t]here is not a dispute merely because the jury is free to disbelieve credible and *unrebutted* testimony." *United States v. Waldron, supra* at 37 n.1 (Everett, C. J., concur-

ring in the result) (emphasis added). Quoting from *United States v. Markis*, 352 F.2d 860, 867 (2nd Cir. 1965), *vacated on other grounds*, 387 U.S. 425, 87 S.Ct. 1709, 18 L.Ed.2d 864 (1967), the court in *Harary* stated: "The mere fact that the jury was still free to disbelieve this portion of the agent's testimony [as to extrajudicial admissions *neither attacked nor contradicted*] does not elevate the issue to a truly 'disputed' one." *United States v. Harary, supra* at 477 (emphasis added).

*Driscoll* is in accord:

> We take *Sansone* to mean that when the government has made out a compelling case, *uncontroverted on the evidence*, on an element required for the charged offense but not for the lesser-included offense, there is a duty on defendant to come forward with some evidence on that issue if he wishes to have the benefit of a lesser-included offense charge. To put it another way, while a judge cannot prevent a jury from rejecting the prosecution's entire case, he is not obligated, under these circumstances, to assist a jury in coming to an *irrational conclusion* of partial acceptance and partial rejection of the prosecution's case by giving a lesser-included offense instruction. *Two prerequisites seem vital [to denying a lesser-included offense instruction]: that there be no factual dispute and that a finding contrary to the only evidence on the issue would be irrational.*

*Driscoll v. United States, supra* at 327 (brackets and emphasis added).

The defense did not contest that the prosecutrix had been attacked and that appellant was in her room. Accordingly, the defense implicitly did not dispute that it was appellant who was the assailant. What the defense *did* contest, however, was that rape had been consummated by penetration; indeed, the fact of penetration was the *sole* issue at trial. To the end of

---

2. This standard is found as far back as the earliest decisions of this Court. *See, e. g., United States v. Clark*, 1 U.S.C.M.A. 201, 2 C.M.R. 107 (1952).

3. Indeed, it is sufficient if it comes solely from the testimony of the accused himself. *See United States v. Evans*, 17 U.S.C.M.A. 238, 38 C.M.R. 36 (1967); *United States v. Kuefler*, 14 U.S.C.M.A. 136, 33 C.M.R. 348 (1963).

causing a reasonable doubt in the minds of the court members on this point, the defense elicited Rooney's acknowledgment that she had passed out inebriated only 30 minutes earlier and that her perceptions immediately upon being awakened from a deep sleep under those circumstances normally might not be accurate. To show, in fact, that her perceptions that night were not accurate, the defense established (1) that her underpants remained on throughout the incident—suggesting that it was implausible that penetration had occurred in such a case; (2) that Rooney at the time was in the midst of her monthly menstrual cycle—indicating that it was implausible that appellant, who had been drinking, could have accomplished penetration under these circumstances, and (3) that Rooney's first version to the CQ immediately after the incident was to the effect that she had rid herself of her assailant before intercourse could be accomplished—arguing that her first impression of what had occurred was more reliable than her later version given after she had time to draw certain conclusions in her own mind.[4] Indeed, according to Rooney's own testimony it only "hit" her that she had been raped several minutes after the event.

Under these circumstances, we conclude that it cannot fairly be said that there was no factual dispute concerning the fact of penetration of the prosecutrix. Not only did the defense elicit evidence from which the fact finders could rationally conclude that Rooney could not and did not correctly perceive that fact upon being awakened by appellant, but also the defense produced affirmative evidence with which the fact finders might rationally buttress that conclusion.[5] Accordingly, the military judge erred in denying the defense request for instructions on lesser included offenses to rape.[6]

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.[7]

Judge FLETCHER concurs.

COOK, Judge (concurring in part and dissenting in part):

I agree with my Brothers that the trial judge erred in refusing to instruct on lesser-included offenses in requiring effectuation of sexual intercourse. I disagree with them, however, as to the remedial measure this Court should direct.

My Brothers concede that "the *sole* issue at trial" was "the fact of penetration." At 167. Elimination of penetration opens the way to consideration of affirmance of lesser offenses reasonably raised by the evidence.

Civilian defense counsel requested an instruction on four lesser offenses—attempted rape, assault with intent to commit rape, indecent assault and assault consummated by a battery. In my view, of the offenses

4. In this Court, the Government has responded with explanations which render these factual circumstances logically consistent with penetration. But it is not the role of this Court to weigh the factual sufficiency of the evidence of guilt; instead, that is for the fact finders, under full and proper instructions.

5. Moreover, in this rather unusual case, there is no medical evidence at all on the issue of penetration, even though the prosecutrix promptly reported the incident to authorities.

6. It may not be gainsaid that—relying on the presumption that members follow instructions of the court—if the members here did not believe that Rooney had been penetrated they would have acquitted the appellant. However, to rest on the application of this presumption under the circumstances here would be entirely inconsistent with the uniform appellate practice of reversing where instructions on lesser-included offenses were appropriate but not rendered. The rationale is that jurors should not be compelled to make an all-or-nothing choice when there is an intermediate alternative that they can rationally consider.

7. There *is* some *evidence in the record that* appellant had been drinking alcohol prior to the events at issue. Since voluntary intoxication could negate appellant's specific intent to rape, which is an element of the principal lesser-included offenses, it is not appropriate to remand this case to the Court of Military Review to consider affirmance of some lesser-included offense.

mentioned no lesser offense than indecent assault, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934, was placed in issue by the evidence. One element of that offense is that the act was "done with intent to gratify the lust or sexual desires of the accused." Para. 213*f* (2), Manual for Courts-Martial, United States, 1969 (Revised edition). My Brothers believe that sufficient evidence of accused's intoxication exists to have required an instruction on the effect of intoxication on accused's intent. They, therefore, conclude that remand to the Court of Military Review "to consider affirmance of some lesser-included offense" is inappropriate. At 168. In my opinion, the evidence of accused's intoxication is altogether two scant to have required an instruction.

Considerable evidence establishes that accused was fully oriented to his surroundings and in full control of his movements at the time of the commission of his wrongful act. For about two hours before the assault on Specialist Rooney, accused had been in Specialist Chubb's room in the same building, with Chubb and several others. They were "sitting around," "drinking beer," and "talking." Chubb testified as a government witness. On cross-examination, he was asked by civilian defense counsel how much beer was consumed. Chubb replied that "each person" consumed "no more than two bottles of beer." All the visitors, including accused, left Chubb's room about 2:00 a. m. Accused next appeared in Specialist Rooney's room. When she challenged him upon her awakening, he left, went down the corridor to a shower room, where he lurked until confronted again by Rooney. On emerging from the shower room, he walked with Rooney to the Charge-of-Quarters' (CQ) desk at the entranceway, but maneuvered himself away from her, and spurted outside. He was sighted proceeding through an areaway between Rooney's building and his own.

Specialist Davis, a government witness, was the CQ of accused's building. He was standing at a window facing the areaway when the accused came up to it. The window was about 8 to 10 feet from the ground. The accused tried to get through the window, but failed. Questioned by civilian counsel about accused's "apparent physical state," Davis testified as follows: "He seemed to be intoxicated to an extent, but not overly intoxicated. He had been drinking, you could tell that." Standing alone, evidence that an accused had consumed intoxicating liquor and was "under the influence" does not provide a sufficient basis from which a "fact finder ... [can] reasonably conclude that there ... [is] a reasonable doubt concerning accused's mental capacity to entertain the requisite intent" for the offense charged. *United States v. Shaw*, 13 U.S.C.M.A. 144, 147, 32 C.M.R. 144, 147 (1962); *see United States v. Backley*, 2 U.S.C.M.A. 496, 498, 9 C.M.R. 126, 128 (1953).

I would, therefore, return the record of trial to the Judge Advocate General of the Army for resubmission to the Court of Military Review to affirm findings of guilty of indecent assault, in violation of Article 134, and reassess the sentence on the basis of those findings.