**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Zvonko BUSIC, Julienne Busic, Petar Matanic, Frane Pesut,
Defendants-Appellants.**

Nos. 383, 389, 410, 411, Dockets 77–1332, 1333, 1334, 1368.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1977.

Decided Oct. 30, 1978.

Edward R. Korman, Chief Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., on brief), for plaintiff-appellee.

Michael E. Tigar and Pierce O'Donnell, Washington, D. C. (Williams & Connolly, Washington, D. C., on brief), for defendants-appellants Zvonko Busic and Julienne Busic.

Paul B. Bergman, New York City (Ford, Marrin, Esposito, Witmeyer & Bergman, New York City, on brief), for defendants-appellants Petar Matanic and Frane Pesut.

Before LUMBARD, FEINBERG and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

Zvonko Busic, Julienne Busic, Petar Matanic and Frane Pesut appeal from judgments of conviction and sentences under the Antihijacking Act of 1974, 49 U.S.C. § 1472(i), following a five-and-one-half week jury trial in the Eastern District of New York. All appellants were convicted of aircraft piracy and conspiracy to commit aircraft piracy in their takeover of T.W.A. Flight 355 en route from LaGuardia Airport to Chicago on September 10, 1976. Zvonko Busic and Julienne Busic were also convicted of the offense of aircraft piracy resulting in the death of another person,[1] a New York City Police Officer killed while attempting to defuse an explosive device which Zvonko Busic had placed in a locker at Grand Central Station.

On July 20, 1977 the trial court sentenced Matanic and Pesut each to thirty years' imprisonment on the aircraft piracy count and to a concurrent term of five years' imprisonment on the conspiracy count. On July 21, 1977 Zvonko Busic and Julienne Busic were each sentenced to the mandatory minimum term of life imprisonment for aircraft piracy resulting in the death of another person and to a concurrent term of five years' imprisonment on the conspiracy count. The court also designated that Julienne Busic be eligible for parole after serving eight years of her sentence, two years

earlier than when she would otherwise become eligible under 18 U.S.C. § 4205(b)(1). This designation is the subject of the government's cross-appeal.[2]

On appeal, Zvonko Busic and Julienne Busic argue that the trial court erred in refusing to dismiss for lack of jurisdiction the charge of aircraft piracy resulting in the death of another person. Zvonko Busic also contends that the court improperly excluded the proffered testimony of a psychiatrist that he was incapable of forming the requisite intent to commit the offenses charged. Julienne Busic asserts that certain items found in her flight bag should not have been admitted into evidence because they were obtained by an unlawful search. All appellants argue that the district court committed reversible error in refusing to instruct the jury on the offense of interference with flight crew members or flight attendants as a lesser-included offense of aircraft piracy. Julienne Busic, Matanic and Pesut all allege that each was denied the right to a fair and impartial trial by the improper remarks and behavior of both the trial court and the prosecution.

A majority of the court finds that each claim of error is without merit. Accordingly, all the convictions are affirmed.

### The Evidence

On Friday evening, September 10, 1976 Trans World Airlines Flight 355 took off from LaGuardia Airport for Chicago. On board the Boeing 727 aircraft were seven crew members and 85 passengers, including Zvonko Busic and Julienne Busic, who were travelling as husband and wife under assumed names, and Marc Vlasic, Petar Matanic and Frane Pesut, who were separately seated on the aircraft and also travelling under assumed names. All five had boarded the aircraft pursuant to an agreement and instructions masterminded by Zvonko

---

1. The jury found Petar Matanic and Frane Pesut not guilty of the offense of aircraft piracy resulting in the death of another person.

2. Prior to trial, a fifth defendant, Marc Vlasic, pled guilty to aircraft piracy. In accordance with the government's recommendation, the

district court sentenced Vlasic to thirty years' imprisonment and specified, pursuant to 18 U.S.C. § 4205(b)(2), that he be immediately eligible for release on parole at the discretion of the United States Parole Commission.

Busic. Each had received a plane ticket and a package of leaflets from Zvonko Busic, along with departure-time instructions and directions not to congregate at the airport.

Shortly after take-off, Zvonko Busic handed flight attendant Tom Van Dorn a sealed envelope to deliver to the captain and then proceeded to the lavatory. Inside the cockpit, Captain Carey opened the envelope and read the following note:

"One, this airplane is hijacked.

"Two, we are in possession of five gel-ignite bombs, four of which are set up in cast iron pans giving them the same kind of force as a giant grenade.

"Three, in addition, we have left the same type of bomb in a locker across from the Commodore Hotel on 42nd Street. To find the locker take the subway entrance by the Bowery Savings Bank. After passing through the token booth there are three windows belonging to the bank. To the left of these windows are the lockers. The number of the locker is 5713.

"Four, further instructions are contained in a letter inside this locker. The bomb can only be activated by pressing the switch to which it is attached but caution is suggested.

"Five, the appropriate authorities should be notified from the plane immediately.

"Six, the plane will ultimately be heading in the direction of London, England."

Captain Carey immediately radioed the note to T.W.A. authorities at J.F.K. International Airport in New York and then dialed the skyjack code for the air traffic control radar location center. Meanwhile, Zvonko Busic had entered the cockpit wearing an apparatus resembling three sticks of dynamite held together by electrical tape, with wires protruding from the sticks, circling his neck and leading down to a battery and an electrical toggle switch. Zvonko Busic, holding the switch with his finger on the lever, ordered Captain Carey to take the airplane toward Europe.

Captain Carey first headed for Montreal, having convinced Zvonko Busic that a refueling stop was necessary for the Boeing 727 to complete a transoceanic flight. En route, Zvonko Busic informed the captain that six hijackers were on the plane, one of whom would remain unidentified. He explained that the purpose of the hijacking would become clear when the authorities received the note accompanying the bomb in the subway locker and that upon receipt of a prearranged code word indicating the fulfillment of their demands the hijackers would surrender in Europe. Zvonko Busic also told Captain Carey that the other hijackers were then explaining their mission to the passengers and attempting to calm them with assurances that no harm was intended. At Carey's request, Zvonko Busic allowed him to announce the hijacking over the public address system.

Julienne Busic then handed out copies of the leaflets to the passengers, inviting them to read and ask questions about the propaganda and offering to help them with any special needs they might have. The leaflets sought to enlist support for a free Croatia, independent of Yugoslavia. Throughout their ordeal, Julienne Busic conversed freely with the passengers. Julienne Busic later decided which passengers would be released at the aircraft's second stopover in Newfoundland.

Petar Matanic rose from his seat when Zvonko Busic emerged from the cockpit shortly after Captain Carey's announcement. Decked out in his dynamite vest, Zvonko Busic handed Matanic a tear gas gun and ordered him to stand up at the front of the passenger section, apparently to keep watch over the cabin. Matanic, a powerfully built, six-foot three-inch, 225 pound man, did as he was told. Later he walked up and down the aisle and acted as a lavatory monitor. Like Julienne Busic, Matanic talked with the passengers throughout their ordeal, further explaining the purpose of the hijacking and some of the planning that preceded it.

Frane Pesut was ostensibly just another passenger on board the aircraft when Cap-

tain Carey made his announcement. Shortly before the aircraft reached Montreal, Vlasic delivered an order from Zvonko Busic to Pesut that Pesut take a seat in the rear of the aircraft. Vlasic then entered the lavatory and returned with a pot, which he ordered Pesut to hold in his lap. Shortly thereafter, Zvonko Busic told Pesut that the covered pot was a bomb and that he must remain seated and hold it. Pesut did so for almost the entire trip. Pesut twice sat in the cockpit with Captain Carey for about an hour. Additionally, when a French military jet appeared alongside the hijacked aircraft over Paris, Pesut got up and drew window shades at other seats and shouted to the passengers to do the same.

Throughout the flight to Europe, Zvonko Busic reminded Captain Carey that the aircraft could be blown up at any time if the demands were not met. He warned the thirty passengers released at Newfoundland that if they failed to distribute leaflets as ordered the remaining passengers' fate would be on their consciences. He spent most of the time sitting in the cockpit with the electric toggle switch in hand. Captain Carey did convince him that the plane must take refueling stops in Montreal, where he dissuaded Zvonko Busic from dropping leaflets out of the aircraft, in Newfoundland, where he succeeded in getting Zvonko Busic to release the thirty passengers, and finally in Iceland, where he persuaded Zvonko Busic to transfer the leaflets to an escorting Boeing 707 aircraft that could safely drop them over London and Paris as Zvonko Busic demanded. Without relief for some seventeen hours and forced to pilot across the Atlantic an aircraft designed and equipped only for domestic travel, Captain Carey nevertheless safely landed the aircraft in Paris.

Meanwhile, responding to the hijack note that Captain Carey had transmitted, members of the New York City Police Department Bomb Squad located subway locker 5713. The locker contained a light blue envelope and a cast iron stew pot with two wires running out from under the pot's lid and taped to the outside. Inside the blue envelope were two propaganda texts and the following typewritten demand note:

"Here are the demands which must be immediately met, one, both of these texts must appear in their entirety in tomorrow morning's edition of the following newspapers: New York Times, all three editions; Los Angeles Times; Chicago Tribune; International Herald Tribune; and Washington Post.

"Two, at least one third of each text must be printed on the first page of the first section. The remainder in the first section.

"Three, through a prearranged code word we shall hear if these demands have been met by tomorrow [sic] deadline. If they have not been met, a second timed explosive device which is likewise in a highly busy location shall be activated. In the event these texts are printed as per instructions, this device will be deactivated.

"Four, the fate of many people hangs in the balance if any attempts whatsoever are made to circumvent our instructions. Fighters for Free Croatia."

The Bomb Squad officers removed the pot from the locker and carefully examined it with several precision instruments. The pot was subsequently transported in a bomb truck to the city's police pistol range in the Bronx and placed in the bomb pit there. Knowing nothing about the pot's contents, yet fully aware that the lives of ninety-two people might hinge on the information obtainable by rendering harmless and then analyzing the mysterious device ("the same type of bomb" as those on the aircraft, according to the hijack note), the explosives specialists decided to attempt a risky dismantling operation rather than a safe, but uninformative, intentional detonation of the device. The officers attached a special automatic cutting device to the two wires, retreated from the pit for an appropriate interval, and then returned to inspect the results. As the two supervising officers, Sergeant Terrence G. McTigue and Officer Brian Murray, squatted around the device for the visual examination, a violent explo-

sion occurred, killing Officer Murray almost instantly and seriously injuring Sergeant McTigue. At trial Zvonko Busic admitted having placed the bomb in the subway locker. The government proved that Julienne Busic's fingerprints were found on the demand note, as well as on the two accompanying propaganda texts.

After the aircraft landed in Paris, Zvonko Busic told Captain Carey that they need only await reception of the prearranged code word. There followed twelve nerve-racking hours for Carey and his passengers as time passed and no code word was received. The passengers were twice herded together in the center of the cabin while Zvonko Busic and Vlasic threatened to kill them. It was finally decided that Julienne Busic should leave the aircraft and attempt to contact information sources in the United States to confirm that the two propaganda texts had been published as demanded. Two hours later Julienne Busic telephoned Zvonko Busic on the aircraft and told him that the demands had been met. After a further delay of several hours, the defendants finally surrendered on Sunday, September 12, at 8:30 A.M. Paris time, some thirty hours after the seizure began. Captain Carey escorted Zvonko Busic, Vlasic, Matanic and Pesut to French authorities, who were already holding Julienne Busic.

Later that same day, French authorities flew the five people in a French military jet to J.F.K. International Airport where custody was transferred to agents of the F.B.I. Immediately after this transfer, the French authorities also turned over the defendants' luggage, which had been taken from the pirated aircraft and transported to New York in a separate area of the French military jet.

Following arrival at F.B.I. offices in New York City and routine booking procedures, each of the suspects was fully advised of his or her constitutional rights and asked if he or she would like to make a statement. Both Zvonko Busic and Matanic chose to do so, and their statements were later used at trial in the government's case. Pesut, who in response to the warnings explained that he did not understand English very well, was handled differently. An F.B.I. agent

with some knowledge of Croatian translated the warnings and then took Pesut's statement, which was also put in evidence by the government. Lastly, Julienne Busic, an intelligent, college-educated person and former teacher, responded to the warnings by indicating that she understood her rights and wished to await the advice of counsel. Thus she never gave a statement. Approximately one hour later, however, during which time she took a brief nap, Julienne Busic emerged from the processing room and was asked to consent to a search of her luggage, which was lying on a nearby desk. Julienne Busic then read and signed the special consent form provided to her and looked through her luggage for some personal belongings. At trial the government introduced three articles later found in Julienne Busic's flight bag: a two-page photocopy containing a diagram of a Boeing 727 and two library cards that led to a volume in the New York Public Library from which the photocopy had been reproduced. The government also showed that Julienne Busic's fingerprints were found on all three articles as well as on the volume's index page referring to the diagram.

All defendants testified at trial. Zvonko Busic freely admitted his role as the mastermind and attempted to take full blame for the entire hijacking operation. He posed a psychological defense, maintaining that he was incapable of forming the requisite intent to commit the offenses charged. Julienne Busic testified that she never intended to participate in the hijacking but went along with her husband because she thought she was pregnant and feared she would never see him again. Matanic and Pesut each testified that he had been invited to accompany Zvonko Busic to Chicago for a secret political meeting where they were to deliver the leaflets. Once on the plane, Zvonko Busic purportedly forced them on threat of death to cooperate in the hijacking.

*Jurisdiction Over Aircraft Piracy Resulting in the Death of Police Officer Murray in New York*

Zvonko Busic and Julienne Busic argue that the district court erred in refusing

to dismiss for lack of jurisdiction the first count of the indictment, charging them with aircraft piracy "which offense resulted in the death of New York City Police Officer Brian Murray" in violation of 49 U.S.C. § 1472(i)(1)(B).[3] They submit that the plain language of the statute, its legislative history, and longstanding rules of statutory construction foreclose their being prosecuted for a homicide not occurring within the "special aircraft jurisdiction of the United States," as that term is defined in 49 U.S.C. §§ 1301(34) and 1472(i)(3). The district court ruled that "under 49 U.S.C. § 1472(i)(1)(B), where the only element of the offense which clearly must be within the special aircraft jurisdiction of the United States is the aircraft piracy, the death resulting therefrom need not also take place therein." We agree.

▆▆ First, the statute itself clearly indicates that while the offense of aircraft piracy can only be committed within the special aircraft jurisdiction of the United States, any death of another person—wherever it occurs—that results from its commission may constitute the aggravated offense of aircraft piracy resulting in the death of another person. Second, Congress' intention to provide a broad scope for the prosecution of suspected air pirates is equally clear. Thus, in reporting the "[b]road, stringent legislation" proposed, the House Committee commented that "[w]hile the legislation is intended to be as broad in its coverage, *geographic and otherwise*, as its plain meaning indicates, it is not intended [to]—and, of course, it cannot—extend beyond such limitations as may be imposed by the Constitution." 1961 U.S.Code Cong. & Admin.News pp. 2563, 2564 (emphasis added). *Cf. United States v. Healy*, 376 U.S. 75, 83–85, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964) (general scope and purpose of § 1472(i)). Third, cases construing analogous statutes lend further support to our conclusion that the death which results from the aircraft piracy need not have occurred within the special area of federal jurisdiction encompassing the underlying offense. *Cf. United States v. Pietras*, 501 F.2d 182, 186–87 (8th Cir.), *cert. denied*, 419 U.S. 1071, 95 S.Ct. 660, 42 L.Ed.2d 668 (1974) (aggravating factor of assault occurred during flight from the underlying offense of armed bank robbery); *Leonard v. United States*, 500 F.2d 673 (5th Cir. 1974) (rape consummated off federal land after abduction there); *United States v. Bamberger*, 460 F.2d 1277 (3d Cir. 1972), *cert. denied*, 413 U.S. 919, 93 S.Ct. 3068, 37 L.Ed.2d 1041 (1973) (shooting during flight from bank robbery).[4] Accordingly, that the death of Officer Murray was proximately caused by the defendants' efforts to implement their hijacking scheme was in our view sufficient to give the district court jurisdiction to try the defendants for that death.[5]

### *Zvonko Busic's Proffered Psychiatric Testimony*

Zvonko Busic contends that the district court improperly excluded psychiatric testimony that he was incapable of forming the requisite intent to commit the offenses charged because he did what he did out of "psychological necessity, not free choice." Pursuant to Rule 12.2(b), Fed.R.Crim.P., Zvonko Busic offered the testimony of Dr. Bernard L. Diamond, an expert in law and

---

3. This Court has already held that trial in the Eastern District was "proper under the Air Piracy Act, and [in accord] with the relevant constitutional policy." *United States v. Busic*, 549 F.2d 252, 253 (2d Cir. 1977).

4. It has long been established that a sovereign has jurisdiction to prosecute an offense where only a part of that offense has been committed within its boundaries. *See Ford v. United States*, 273 U.S. 593, 619–24, 47 S.Ct. 531, 71 L.Ed. 793 (1927).

5. The purpose behind placing a live bomb in the subway locker was to impress upon the authorities the hijackers' deadly seriousness and to demonstrate their ability to carry through instantly on their threats by identical devices located on board the hijacked aircraft, even though these devices later proved to be dummies. Captain Carey testified that one of Zvonko Busic's central concerns was whether the authorities had followed the instructions in the hijack note and those placed in the subway locker.

psychiatry, who was prepared to testify that:

> "Zvanko [*sic*] Busic was in an abnormal mental state on September 10, 1976 when he is alleged to have committed air piracy, homicide, and other criminal acts. . . . It is also my opinion that this abnormal mental state was of such a quality and degree that it prevented the defendant from exercising the ordinary, reasonable and rational powers of free-will, choice and decision that constitute the intent required by the definitions of the crimes of which he is charged. Hence, I conclude that Zvanko [*sic*] Busic lacked the capacity for such criminal intent.
>
> "I am of the opinion that this abnormal mental state was not caused by mental disease, illness or defect. I do not find the defendant insane or mentally ill in any sense of those terms.

> \* \* \* \* \* \*

> " . . . He did what he did out of psychological necessity, not free choice."

The district court concluded that the evidence was not admissible for the narrow purpose specified. We agree.

In offering this testimony, counsel for Zvonko Busic sought to prove both too little and too much. Counsel explicitly stated that he was not offering the testimony to support an insanity defense under Rule 12.2(a), Fed.R.Crim.P., and this court's decision in *United States v. Freeman*, 357 F.2d 606, 622 (2d Cir. 1966). Rather, he offered it to raise the defense of a mental condition negativing the mental element required for the charged offenses under Rule 12.2(b) and *United States v. Brawner*, 153 U.S.App.D.C. 1, 30–34, 471 F.2d 969, 998–1002 (1972) (en banc). But *Brawner* has no application here.

 The availability of a *Brawner*-type defense turns upon whether the offense in question "like deliberated and premeditated murder[,] requires a specific intent that cannot be satisfied merely by showing that defendant failed to conform to an objective standard." 153 U.S.App. D.C. at 30, 471 F.2d at 998 (footnote omitted). The offense of aircraft piracy, however, requires a showing of general criminal intent, not a showing of specific criminal intent. *See United States v. Greene*, 497 F.2d 1068, 1086 (7th Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Bohle*, 445 F.2d 54, 60 (7th Cir. 1971). *See also United States v. Lee*, 539 F.2d 606, 608 (6th Cir. 1976); *United States v. Meeker*, 527 F.2d 12, 14 (9th Cir. 1975) (construing offense of interference with flight crew members or flight attendants as a general intent crime); *United States v. Flum*, 518 F.2d 39, 41–44 (8th Cir.) (en banc) *cert. denied*, 423 U.S. 1018, 96 S.Ct. 454, 46 L.Ed.2d 390 (1975) (intent to conceal not an essential element of offense of carrying a concealed deadly or dangerous weapon on board an aircraft). Of course an intent to perform the proscribed conduct is a necessary element of any serious criminal offense. *See Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). But the need to prove a "special" intent arises only by operation of law when something more is required. *See e. g., United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976) (per curiam) (wilfully falsifying tax returns requires a voluntary, intentional violation of a known legal duty); *United States v. Winston*, 558 F.2d 105, 109 (2d Cir. 1977) (voluntary and intentional violation of known legal duty required for criminal violation of Railway Labor Act); *Kane v. United States*, 399 F.2d 730, 736 (9th Cir. 1968), *cert. denied*, 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699 (1969) (first degree murder requires willful, deliberate, malicious and premeditated specific intent). Here, no such additional requirement was created by Congress' insertion of the "wrongful intent" language into the statute. These words merely connote the general mental culpability required for the commission of any serious crime. *See United States v. Howard*, 506 F.2d 1131, 1133 (2d Cir. 1974).

 The trial court found, and we agree, that Zvonko Busic had this requisite general criminal intent. It is not disputed

that Zvonko Busic intended to hijack the plane. Moreover, Zvonko Busic admitted that he knew hijacking was against the law. We have recently described this general criminal intent as defendants' "consciousness, intention and awareness of what they were doing." *United States v. Winston, supra.* Whatever the merits of psychiatric testimony where the defendant raises an insanity defense, where he has raised no such defense, as here, questions of intent and motivation are for the jury and not for expert witnesses. We do not recognize that experts in law and psychiatry are so much better qualified than jurors to pass upon the question of a defendant's intention to commit the act of piracy that the court must receive their testimony. In short, whatever the proferred "psychological necessity" testimony was meant to show, the district court properly excluded it.

### Julienne Busic's Flight Bag

Julienne Busic asserts that the three items found in her flight bag and their evidentiary fruits were obtained by an unlawful search of the bag and should have been suppressed. When Julienne Busic left the plane in Paris to ascertain whether the hijackers' demands had been met, she left behind a flight bag which was taken from the plane by the French authorities and subsequently turned over to the F.B.I. at J.F.K. Airport. After securing her written consent, the federal agents searched the bag and found the items later introduced at trial against her.

The district court initially granted Julienne Busic's pretrial suppression motion on the ground that her consent to the search was involuntary in light of her tired condition. Upon the government's motion for reargument and the presentation of further evidence, the court reversed its ruling, holding that probable cause to search the bag for dangerous explosives existed and that the search was therefore justified. Although we cannot agree with the district court that there was probable cause to search for explosives, we find no error in the admission of the evidence, first, because we agree with the government that Julienne Busic executed a valid consent to the search of her luggage, second, because we find that Julienne Busic retained no legitimate expectation of privacy in her bag which the Fourth Amendment should protect, and third, because the Fourth Amendment and its exclusionary rule do not reach the law enforcement activities of foreign authorities acting in their own country.

■ We find the district court's ruling that Julienne Busic did not voluntarily consent to the search of her bag clearly erroneous in view of "the totality of the circumstances." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Mariani,* 539 F.2d 915, 922–23 (2d Cir. 1976). Julienne Busic was the most educated and intelligent of all the suspects. Despite her weariness, she chose to remain silent after the *Miranda* warnings were read to her. And it was after this assertion of her right to remain silent, and after a time when she was able to sleep briefly, that she consented to the search of her bag.[6] Moreover, her consent was given in the absence of any inherently coercive pressure and upon intelligent appraisal of her right to refuse such consent. In this light, Julienne Busic's consent was surely her own "essentially free and unconstrained choice," *United States v. Watson, supra,* 423 U.S. at 424, 96 S.Ct. 820, *quoting from Schneckloth v. Bustamonte, supra,* 412 U.S. at 225, 93 S.Ct. 2041. *See United States v. Lemon,* 550 F.2d 467, 471–73 (9th Cir. 1977); *United States v. Tortorello,* 533 F.2d 809, 814–15 (2d Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976).

■ Furthermore, Julienne Busic had no expectation of privacy which our law

---

**6.** Julienne Busic could validly consent to the search even after receiving her *Miranda* warnings and exercising her right to remain silent. *Compare Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), *with United States v. Lemon,* 550 F.2d 467, 471–73 (9th Cir. 1977), and *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir. 1974).

should recognize. The Supreme Court has recently reminded us that the Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Julienne Busic had no legitimate expectation of privacy in her bag when she left it in a place which she and her associates had illegally seized. *See United States v. Cole,* 416 F.2d 827 (6th Cir. 1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1272, 25 L.Ed.2d 537 (1970); *United States v. Parizo,* 514 F.2d 52 (2d Cir. 1975). *Cf. Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960) ("wrongful presence" cannot establish standing to "invoke the privacy of the premises searched"). Indeed, it is difficult to imagine a situation where a less reasonable and less legitimate expectation of privacy might exist than where a hijacker abandons luggage in a hijacked airplane.

■ Finally, the Fourth Amendment and its exclusionary rule do not apply to the law enforcement activities of foreign authorities acting in their own country. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). *Cf. United States ex rel. Lujan v. Gengler,* 510 F.2d 62 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (federal officials' conduct outside United States); *United States v. Toscanino,* 500 F.2d 267 (2d Cir.), *reh. en banc denied,* 504 F.2d 1380 (2 Cir. 1974). It is undisputed that Julienne Busic's flight bag was seized and confiscated by French authorities, who in turn gave the forfeited property to agents of the United States at J.F.K. Airport when the suspects' transfer of custody was formally effectuated. As there is no basis for Julienne Busic's claim that the action of the French authorities in seizing the bag violated her constitutional rights, she cannot challenge the action of the French authorities in turning the bag over to the F.B.I. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921);

*Cf. United States v. DeBerry,* 487 F.2d 448, 450–51 (2d Cir. 1973) (reassertion of control over bag previously seized lawfully); *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (silver platter doctrine abolished).[7]

*Instruction on a Lesser-Included Offense*

■ All appellants claim that the district court erred in denying their request pursuant to Rule 31(c), Fed.R.Crim.P., to instruct the jury on the offense of interference with flight crew members or flight attendants as a lesser-included offense of aircraft piracy. Title 49 U.S.C. § 1472(j) prohibits interference with the performance of any flight crew member or flight attendant by assault, intimidation, or threats. Zvonko Busic argues that the jury could have accepted his psychological defense and found him guilty of simple interference because it does not require "wrongful intent." The other appellants apparently assert that the jury could have accepted their defenses that they never intended to hijack the plane but nonetheless could have found that they interfered with flight personnel once on board. The district court denied the requests on the ground that interference with flight personnel is a different offense and not a lesser offense included in aircraft piracy. We hold that the court's refusal to give the requested charge was correct. On the evidence presented, it would have been unreasonable for the jury to acquit any of the defendants of aircraft piracy yet to convict them of interference with flight personnel.

According to the Supreme Court, "[i]n a case where some of the elements of the crime charged themselves constitute a lesser crime, the defendant, if the evidence justifie[s] it . . . [is] entitled to an instruction which would permit a finding of guilt of the lesser offense." *Sansone v. United States,* 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965), *quoting Berra v. United States,* 351 U.S. 131, 134, 76

7. We do not reach the question of the extraterritorial application of the Fourth Amendment where foreign authorities act as the agents of American authorities. Defendants made no such allegation here.

S.Ct. 685, 100 L.Ed. 1013 (1956). But while we begin with the premise that defendant is ordinarily entitled to a lesser-included offense instruction whenever the lesser offense is completely encompassed within the greater, the exceptions to this rule delineated by the Supreme Court support the trial court's refusal to give a lesser-offense instruction.

First, "a lesser-offense charge is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to both the lesser and greater offenses." Sansone, supra, 380 U.S. at 349–350, 85 S.Ct. at 1009, citing Berra, supra, and Sparf v. United States, 156 U.S. 51, 63–64, 15 S.Ct. 273, 39 L.Ed. 343 (1895).[8] Here, the only factual issue placed into contention by the defendants was their lack of the requisite intent for air piracy.[9] But we have already held that neither air piracy nor interference with flight personnel are specific intent crimes. Both are general intent crimes. Accordingly, the only factual issue to be resolved by the jury was the same for both the lesser and greater offense and the defendants were therefore not entitled to a lesser-offense charge. The defense did not seriously dispute issues of fact, such as whether the defendants had actually "seized" the airplane, which would have justified instructing the jury that the defendants might have interfered with flight crew personnel without having "seized" the airplane. Upon their own view of the entire proof offered at trial, either the defendants were not guilty of any criminal offense or they were guilty of the offense charged. In short, where the charge is air piracy and the defense concedes all elements of the crime but intent, the defense is not entitled to a lesser-offense instruction. See Sansone v. United States, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965) (sole issue one of willfulness, which was element of both greater and lesser offenses). See also Keeble v. United States, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); Driscoll v. United States, 356 F.2d 324 (1st Cir. 1966), vacated on other grounds, 390 U.S. 202, 88 S.Ct. 899, 19 L.Ed.2d 1034 (1968). Compare United States v. Harary, 457 F.2d 471 (2d Cir. 1972) (entrapment fully exculpatory defense) with United States v. Crutchfield, 547 F.2d 496, 501 n. 4 (9th Cir. 1977) (partial entrapment defense).

Second, a defendant is entitled to a lesser-offense charge only where there is some rational basis for such a charge and "the evidence justifies it," Sansone, supra, 380 U.S. at 349, 85 S.Ct. at 1004. Thus a defendant is not entitled to a lesser-offense charge merely because he formally contests elements of the greater charge which distinguish it from the lesser. The contest must be real. He must produce enough evidence to justify a reasonable juror in concluding that he committed the lesser offense but did not commit the greater offense. Here the defense did not produce evidence which would allow a reasonable juror to conclude that the defendants knowingly interfered with flight crew personnel but did not knowingly hijack the airplane. Cf. United States v. Enos, 453 F.2d 342 (9th Cir. 1972) (stabbing another person in the back with a knife constitutes an assault

---

8. This is necessarily so because where the only factual issue to be resolved by the jury is the same for both the lesser and greater offense, the defendant has not presented a defense which distinguishes the two offenses but one which applies equally to both and which is either fully exculpatory or no defense at all. The defendant has not asserted that he may have committed the lesser crime but not the greater; he has asserted that he has committed no crime at all. Under these circumstances, which crime the defendant committed is not an issue for trial as the defendant has conceded all elements which distinguish the two offenses.

Here, the existence or the absence of the requisite intent cannot distinguish the two offenses but provides an all or nothing defense to both.

Neither the prosecution nor the defense can go to the jury on both the lesser and the greater offense unless an element which distinguishes the two is actually disputed. United States v. Harary, 457 F.2d 471 (2d Cir. 1972).

9. Zvonko Busic's defense was that he was psychologically incapable of forming the requisite intent. Similarly, Julienne Busic, Matanic and Pesut each presented a defense of duress, that Zvonko Busic had first duped and then coerced them.

with a deadly weapon, precluding an instruction on the included offense of simple assault); *United States v. Sinclair,* 144 U.S. App.D.C. 13, 444 F.2d 888 (1971) (in prosecution for burglary, evidence that defendant was found hiding in a store which had a broken window and a locked door did not require an instruction on the lesser offense of unlawful entry); *United States v. Beneke,* 449 F.2d 1259 (8th Cir. 1971) (instruction on lesser offense of malicious mischief not required in prosecution for entering draft board office to remove and destroy official records). The decision whether there is enough evidence to justify a lesser-offense charge rests within the sound discretion of the trial judge. That discretion was not abused here.

■ Third, a lesser-offense charge is not available to the defendant on the ground that the rule entitles him to "plead for mercy." *Kelly v. United States,* 125 U.S. App.D.C. 205, 370 F.2d 227, *cert. den.* 388 U.S. 913, 87 S.Ct. 2127, 18 L.Ed.2d 1355 (1967). It is both unreasonable and impermissible to provide the jury with an opportunity to render a lenient or compromise verdict with no evidentiary basis.

### Miscellaneous Claims of Petar Matanic and Frane Pesut

■ Matanic and Pesut complain that the court below should have directed the government to disclose the F.B.I. 302 reports of interviews with each of the aircraft's passengers and crew. The court quite properly refused to order disclosure of most of these reports. The defendants had a list of all passengers and crew and could give no reason why further disclosure would show anything of an exculpatory nature. In addition, they had made no showing that they had been unable to interview any of the passengers and crew. *Cf. Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

■ Matanic and Pesut also complain that their sentences improperly resulted from the court's overly mechanical approach and from its clear misconception of the jury's verdict. This claim is without merit. The district court delivered detailed statements justifying their sentences. *Compare United States v. Ramos,* 572 F.2d 360, 362 (2d Cir. 1978).

### The Government's Cross-Appeal

The government appeals from that part of Julienne Busic's sentence which designated, pursuant to 18 U.S.C. § 4205(b)(1), that she be eligible for parole after serving only eight years of her life sentence, rather than the ten year minimum otherwise applicable under 18 U.S.C. § 4205(a). The government argues that the district court had no authority to designate Julienne Busic's sentence under § 4205(b)(1) because it was a mandatory minimum sentence prescribed by 49 U.S.C. § 1472(i)(1)(B) for aircraft piracy resulting in death and was therefore not covered by § 4205(b)(1). The government points both to the plain language of the statutory subsection on early parole eligibility and to Congress' past general intent regarding early parole eligibility for persons subject to mandatory life sentences. Counsel for Julienne Busic contests our jurisdiction to entertain this appeal under 28 U.S.C. § 1291 and the propriety of our reviewing the early parole eligibility designation under 28 U.S.C. § 1651, the government's alternate asserted basis for jurisdiction.

We hold that jurisdiction to entertain the government's appeal is properly founded on 28 U.S.C. § 1291. With respect to the merits, we find that § 4205(b)(1) empowered the district court to designate that Julienne Busic be eligible for parole after serving eight years of her life sentence.

■ Jurisdiction to entertain the government's cross-appeal is provided by 28 U.S.C. § 1291. The early parole eligibility designation involved here is an element of the district court's sentence order which is distinct from the judgment of conviction entered upon the jury's verdict of guilty. The district court's sentence order, containing the early parole eligibility designation, possesses the necessary "characteristics of independence and completeness" required

for review under 28 U.S.C. § 1291 without regard to the limitations of 18 U.S.C. § 3731. *Carroll v. United States,* 354 U.S. 394, 406, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957).[10] The order is clearly a "final decision," both within the meaning of the statute, *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), and within the meaning generally given in the context of criminal proceedings, *Berman v. United States,* 302 U.S. 211, 212–13, 58 S.Ct. 164, 82 L.Ed. 204 (1937). Just as surely, it is "truly collateral to the criminal prosecution itself in the sense that [it] will not 'affect, or . . . be affected by, decision of the merits of this case.'" *Abney v. United States,* 431 U.S. 651, 660, 97 S.Ct. 2034, 2041, 52 L.Ed.2d 651 (1977), *quoting from Cohen v. Beneficial Industrial Finance Corp., supra,* 337 U.S. at 546, 69 S.Ct. 1221.[11]

█ Turning to the merits, we find that the district court possessed statutory authority to make the early parole eligibility designation. First, § 4205(b) neither explicitly nor implicitly excludes life sentences from its scope. Moreover, a reading of § 4205 as a whole indicates that Congress meant to vest the sentencing court with authority under § 4205(b) to designate that a person subject to a life sentence be eligible for parole earlier than the ten year maximum prescribed by § 4205(a).

█ Second, we reject the government's argument that Section 7 of Pub. L. No. 85–752, 72 Stat. 847 (1958) (never codified),

which once provided that the early parole eligibility provisions do "not apply to any offense for which there is provided a mandatory penalty," now precludes this reading of § 4205. The recently enacted Parole Commission and Reorganization Act of 1976, 18 U.S.C. §§ 4201–18, explicitly repealed Chapter 311 (Parole) of Title 18, of which Section 7 was an uncodified amendment. *Compare Warden v. Marrero,* 417 U.S. 653, 657–59, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974) (repealed provision remained applicable to offender by reason of specific savings clause). Moreover, mindful of the Supreme Court's admonition against reading "a substantial change in accepted practice into a revision of the Criminal Code without any support in the legislative history of that revision," *Muniz v. Hoffman,* 422 U.S. 454, 470, 95 S.Ct. 2178, 2187, 45 L.Ed.2d 319 (1975), we find support for our view in the legislative history of the new parole law. Section 4205(h) now covers the ground once taken by Section 7 by providing that "[n]othing in this chapter shall be construed to provide that any prisoner shall be eligible for release on parole if such prisoner is ineligible for such release under any other provision of law," thus leaving the denial of parole eligibility for explicit pronouncement elsewhere.[12] With respect to aircraft piracy, Congress omitted such an exclusion of parole eligibility. Indeed, the House Committee, when reporting the special skyjacking provisions, expressly relied on the early parole eligibility statute in proposing the harsh sentences made availa-

**10.** We thus disagree with and decline to follow *United States v. Lane,* 284 F.2d 935 (9th Cir. 1960), which dismissed the government's appeal from a probation order of the district court, although it granted the relief requested by issuing a writ of mandamus.

**11.** We also agree that "[t]he government has challenged the district judge's power to impose the sentence that he did, and such an issue of judicial power has long been recognized as falling squarely within the narrow range of cases for which mandamus [may be] appropriate." *United States v. Jackson,* 550 F.2d 830, 831 (2d Cir. 1977). *See also* note 10, *supra.*

**12.** The repeal and replacement of Section 7 by Section 4205(h) of the Parole Commission and Reorganization Act of 1976 received scant at-

tention in the legislative history, apparently because Congress was satisfied with the interpretation of federal parole law at the time it passed the new legislation. For instance, in following Mr. Justice (then Judge) Blackmun's lead in *Jones v. United States,* 419 F.2d 593, 594, 599 (8th Cir. 1969), which had narrowly interpreted the term "mandatory penalty" in Section 7 to mean "a sentence which must be served devoid of the benefits of suspension [of sentence], probation, and parole," the Ninth Circuit had expressly held that Section 7 was not an obstacle to parole eligibility for a defendant convicted of aircraft piracy. *United States v. Ortiz,* 488 F.2d 175, 178–79 (9th Cir. 1973).

ble for aircraft piracy. 1961 U.S. Code Cong. & Admin. News pp. 2563, 2568. When it was later provided that the minimum sentence for aircraft piracy resulting in the death of another person would be life imprisonment, there was no indication that Congress had altered its view that early parole eligibility was available.[13]

 Third, both the strong congressional policy favoring parole evidenced in the new Parole Commission and Reorganization Act and the belief that district courts should be given as much room as possible for exercising their sentencing discretion support our conclusion. Accordingly, we find no error in the district court's designation that Julienne Busic be eligible for parole after serving eight years of her life sentence.

### The Interruptions of Summations for Matanic and Pesut

 Julienne Busic, Matanic and Pesut ask for a new trial on the ground that the court's bias and hostility permeated the proceedings and deprived them of a fair trial. We have examined the incidents complained of, and, with one exception, we are in agreement that they do not require remedial action. That exception is the court and the government's treatment of counsel for Matanic and Pesut during their summations to the jury.

Judges Feinberg and Timbers, for reasons set forth in their concurring opinions, find the claims of error insubstantial.

Judge Lumbard dissents. All that here follows under the above heading is his discussion of the reasons why the convictions of Matanic and Pesut should be reversed.

The summations of counsel for Matanic and Pesut were inexcusably interrupted by the court and by government counsel on so many occasions and in such a manner that the presentation of their defenses to the jury was seriously prejudiced. Matanic and Pesut were as a result deprived of the effective assistance of counsel guaranteed them by the Sixth Amendment. The trial judge's interruptions, in particular, made both a connected argument by counsel and sustained concentration by the jury impossible. The focus of attention moved from counsel's argument to the court's interjections. These interruptions, moreover, made clear the trial judge's doubts about defense counsel's view of the law and the facts. Each juror must have known that the trial judge had found Matanic's and Pesut's defenses unpersuasive.

The taking of evidence was concluded on Thursday, April 28, 1977. The court then advised counsel that they would be allowed one day for all the summations. The court would start at 9:00 A.M., earlier than usual, and sit until 6:00 or 7:00 P.M., later than usual.[14]

Mr. Schlam made the opening summation for the government. Although he had expected to take only three hours, he spoke for five and one-half hours starting at 9:00

---

**13.** We therefore agree with the recent decision of the Sixth Circuit in *United States v. Remling,* 548 F.2d 1274, 1274–75 (6th Cir. 1977) (per curiam):

"While the issue is not without difficulty, we conclude that the legislative history of the anti-hijacking legislation leads to a different result from that in *Hardaway* [*United States v. Hardaway,* 350 F.2d 1021 (6th Cir. 1965), which treated the sentencing language of the armed postal robbery statute as "mandatory" within the meaning of Section 7]. We thus align ourselves with the position of the Ninth Circuit in *United States v. Ortiz,* 488 F.2d 175 (9th Cir. 1973), which held that 49 U.S.C. § 1472(i) does not provide for a mandatory penalty, therefore allowing the trial judge the discretion to impose an indeterminate sentence under § 4208. The statute does not expressly prohibit early parole and, as pointed out by the Ninth Circuit in *Ortiz, supra,* at 179 n.1 the earlier version of the statute was conceived by the Congress to be subject to the early parole provisions. House Report No. 958, Aug. 16, 1961, reprinted in 1961 U.S.Code Cong. & Admin. News P. 2568. Our conclusion is fortified by the observation that the 1974 amendments to the penalty provisions, pursuant to which Remling was sentenced, were passed after *Ortiz* and no dissatisfaction with the Ninth Circuit's construction was expressed."

**14.** Throughout the more than five weeks of trial, the jury was accustomed to beginning at 10:00 A.M. and concluding at approximately 5:00 P.M.

A.M. and finishing at about 3:30 P.M. The only interruption of Schlam's summation was the court's query about repetition after five hours of argument.

After Schlam concluded, defense counsel spent some 45 minutes, in the jury's absence, asking the court to instruct the jury regarding numerous matters which they claimed Schlam had misstated. When the jury returned, the court commented on only four of Schlam's statements, which the court minimized as mere "exaggerations." [15]

Mr. Rochman, Pesut's counsel, began his summation late in the afternoon. After he had spoken for only a few minutes, the court interrupted counsel's fair and rather ordinary introductory comments concerning the seriousness of the case with a brusk "No. Just a minute. I thought you said we are not going to appeal to sympathy." A short while later Rochman was abruptly interrupted by Schlam's objection to his argument about the need for Croatian-Americans such as Pesut to observe secrecy in their political meetings. Reacting to Schlam's objection, Rochman complained "Mr. Schlam spoke for five and one-half hours without interruption." The court remarked that as the defendants had restrained themselves until Schlam was finished, he would ask Schlam to refrain until counsel had finished.

Having cautioned Schlam not to interrupt, the court nevertheless did so itself on eleven subsequent occasions to question Rochman's arguments and six more times to comment on volume, repetition and length. Most of the eleven substantive interruptions involved the court's interjecting its own view of the evidence, such as "I find no evidence in this case. . . ." The court was frequently wrong. Not one of the interruptions was necessary.

By the time Rochman had finished it was past 6:00 P.M., later than the court had sat on any trial day, and after counsel and one of the jurors had already remarked on the

heat. The court simply advised the jury that it would hear one more summation but would not sit beyond 8:00 or 8:10 P.M. Then, with but a five minute recess and a promise of coffee, the judge moved the case along, explaining that he saw no other way to get the summations done.

It was after 6:30 P.M. when Matanic's counsel, Mr. Bergman, began his summation which, delayed by over 40 interruptions, lasted until almost 9:30 P.M. Before adjournment and in the absence of the jury, counsel for Matanic moved for a mistrial "on the basis of the comments made by the court and by Mr. Schlam" during his summation. Pesut's counsel also moved for a mistrial because of the disparate treatment given the defense and the government. The court denied both motions.

An examination of each of the interruptions, comments, and objections made by the court and government counsel shows that there was no reason why each and every one of them could not have been reserved for appropriate consideration by the court after the summation was finished, just as with government counsel's summation. Instead, on numerous occasions the court jumped in without justification, first questioning and then often debating with counsel whether any evidence supported counsel's statement, only to find that in every instance it had misinterpreted counsel's argument, erroneously recollected evidence, or made an unnecessary or irrelevant comment.

The court interrupted Bergman 44 times, in most cases on its own motion. On a minority of these occasions, however, the court followed up objections by government counsel; Schlam himself participated in 20 interruptions. In total, the interruptions must have extended Mr. Bergman's summation by almost one hour. As any detailed exposition is unnecessary to these conclusions and would unduly lengthen this opinion, a summary of all the interruptions is appended.

---

15. Later, after Mr. Rochman's summation for Pesut, the court commented on one additional argument by Schlam, his use of Mr. Busic's post-arrest statement to incriminate the other defendants, a clear violation of the hearsay principle of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The total impact of these interruptions was to deprive Matanic of the effective assistance of counsel during a crucial phase of the trial. In the face of constant interference and comments which were in every instance unnecessary and sometimes irrelevant, it was impossible for counsel to make a sustained argument or to keep the attention of the jury. It would have been difficult for counsel to do so under any circumstances at the end of such a long day of talk, far longer than the usual court day and with no sustenance but a belated ration of coffee. As no objection was made to this schedule, the court is not to be faulted for this attempt to expedite the trial. At the same time, these circumstances could not help but exacerbate the difficulties under which counsel were required to labor. This tight schedule placed the court and government counsel under a special obligation to give defense counsel a full opportunity for fair argument, free of unnecessary interruptions which might make it more difficult for the jury to give fair attention to the arguments.

By the next morning the trial judge must have realized that his treatment of defense counsel needed some explanation. Before the jury was called, he commented to counsel "9:30, I think, without dinner was too much. I don't think we ought to repeat that performance." To the jury, he commented that he had interrupted Mr. Bergman "several times" in his summation because he had thought that some of the arguments had no basis in the evidence, but that their recollection governed and he "could be wrong." He added that he had checked and found that one of his interruptions was not justified; this concerned the argument that Matanic's actions on the plane were for the protection of the passengers and that Matanic felt he had been coerced. The trial judge said there was some evidence to support that argument and that it was up to the jury to give it such consideration as they thought proper. The judge also said that he would look at the transcript to see if he had made other errors, adding that his interruptions must not be considered any reprimand of Mr. Bergman, who was doing his duty.

Counsel for Julienne Busic and for Zvonko Busic then followed with brief summations. There was not a single interruption of these two summations. Government counsel's rebuttal summation of almost an hour was interrupted just twice, with the court's permission.

Later in the day, at the very end of his charge to the jury, the trial judge said he had checked all the interruptions of Mr. Bergman and had "only one comment to make." He said that it had been proper for Bergman to point out that the jury would have no chance to come back once they had begun consideration of the case. He conceded that he should not have called Bergman's comment intimidation since Bergman had the right to say what he did.

Although the court's treatment of Pesut's counsel was less severe than that accorded Matanic's counsel, I believe that the court's conduct of the proceedings during each summation seriously prejudiced Pesut and Matanic. Pesut and Matanic had presented identical defenses. Each testified that he had been invited to a political rally in Chicago and that after Zvonko Busic's takeover of the plane each had acted under Zvonko Busic's threats of death. The single issue raised by their defenses was whether each had intentionally participated in the aircraft piracy. This question turned essentially on the circumstantial inferences to be drawn from the evidence. At the end of a long trial the jury will have forgotten much of the evidence. It can have in mind only bits and pieces of the evidence, much of it unconnected and of uncertain relevance to the opposing contentions of the government and the defense. Thus it was essential that the accumulated evidence, and all the inferences to be drawn from the evidence, be summarized for the jury by counsel, with reference to the charges in the indictment and the defenses to those charges.

The government's case was stated at great length and in detail for over five hours during the early hours of the court day when the jury was fresh. Although

government counsel spared no language in condemning the actions of the defendants, and drew numerous inferences, some of which the court later found to be unsupported, the five and a half hour harangue was uninterrupted. In my opinion, the defense was entitled to equal treatment. It was especially important that the treatment be equal because counsel for Pésut and Matanic found themselves compelled to argue at the end of the day, in a hot courtroom, to a jury sitting late into the evening, well beyond the customary dinner hour and without food. This state of affairs had come about largely because government counsel exceeded by two hours its allotted time for its opening statement.

Fundamental fairness required that defense counsel, placed at such an obvious disadvantage, be treated with equal consideration. The court's failure to see that this was done, due in principal part to the court's own deliberate and frequent interruptions of the summations, deprived the defense of a fair and equal opportunity to make a sustained and continuous argument; it also served to emphasize to the jury the court's disbelief in the defense arguments and its preference for the government. It made the defense summations seem to the jury like a comedy of errors, rather than a serious presentation by responsible counsel. It distracted the jury's attention from the thread of counsel's argument and focused it on the nit-picking indulged in by the court and by government counsel.

The denial of the opportunity to make a summation for the defense in a criminal trial, even where the case is tried to the court, is a deprivation of the accused's basic right to make his defense. The Supreme Court recently so held in *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), in overturning a New York statute which granted the judge in a non-jury trial discretion to deny any opportunity for summations. Mr. Justice Stewart wrote for the Court:

"It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt. See *In re Winship,* 397 U.S. 358 [90 S.Ct. 1068, 25 L.Ed.2d 368].

"The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." 422 U.S. at 862, 95 S.Ct. at 2555.

*See also id.* at 858–59 nn.8 & 9, 95 S.Ct. 2550, and the cases there cited. The Court concluded that the denial of closing arguments even in a non-jury case violated the right to the assistance of counsel guaranteed by the Sixth Amendment. *Id.* at 865, 95 S.Ct. 2550. *A fortiori,* in a trial to a jury where each defendant faces a possible sentence of many years—up to life—in prison, the right to effective assistance of counsel is also denied where continuous and unnecessary interruptions by the court so interfere with defense counsel's presentation that counsel is unable to make an orderly and sustained argument to the jury.[16] *Cf.*

---

16. Lloyd Paul Stryker has described the summation as the apex of an attorney's trial representation:

"The summation is the high point in the art of advocacy; it is the combination and the culmination of all of its many elements. It is the climax of the case. It is the opportunity to rescue a cause until that time perhaps seemingly lost. It calls for every skill the advocate possesses. It calls for more than skill—it is a summons to his courage, a testing ground of his character, a trial of his logic

*Matthews v. United States,* 145 U.S.App. D.C. 323, 449 F.2d 985 (1971) (ineffective summation "constitutional error") (dictum); *United States v. Hammonds,* 138 U.S.App. D.C. 166, 425 F.2d 597 (1970) (ineffective summation denial of due process); *Johns v. Smyth,* 176 F.Supp. 949 (E.D.Va.1959) (failure to argue case to jury denial of due process).

Although the jury had heard nearly 50 witnesses during 21 trial days, extending from March 23 to April 28, 1977, it remained for counsel to summarize the case before the jury, to assess the evidence in terms of the charges, and to argue the weight to be given the evidence and sufficiency of the proofs. The jury could perform its function only with the help of counsel for both sides, particularly in light of the court's decision (previously disclosed to counsel) not to marshal the evidence. *See United States v. Kahaner,* 317 F.2d 459, 479–80 and n.12 (2d Cir.), *cert. denied sub nom. Keogh v. United States,* 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963). After the extensive arguments made by government counsel, uninterrupted by defense counsel or by the court, fundamental fairness required that defense counsel be permitted to reply fully and fairly in kind. *Cf. United States v. Sawyer,* 143 U.S.App.D.C. 297, 298, 443 F.2d 712, 713 (1971) (trial court's discretion in controlling scope of summations abused "if the court prevents defense counsel from making a point essential to the defense"). Here the tone and nature of the court's numerous interruptions, supplemented by government counsel's many interferences, foreclosed any opportunity for appropriate reply, effectively nullifying counsel's arguments by disparaging them and questioning their factual bases, and doing so erroneously in many instances. The trial court's limited explanation the next day was simply too little and too late to redress the irreparable damage done the evening before. *See Quercia v. United*

and reasoning powers, his memory, his patience and his tact, his ability to express himself in convincing words; in short, it is an assay of every power of persuasion he possesses."

*States,* 289 U.S. 466, 469–72, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). Counsel for Matanic and Pesut were deprived of a fair opportunity to argue their clients' case to the jury, a right guaranteed to the defendants by the Constitution. The convictions of Matanic and Pesut should not stand; they are each entitled to a new trial.

Inasmuch as my brothers do not agree with me on this last point, the convictions of all appellants are affirmed.[17]

## APPENDIX

### *Summary of Interruptions During Mr. Bergman's Summation.*

Bergman had barely begun his summation before the court broke in to challenge his suggestion that the jury could act as his advocate at the conclusion of the arguments since he could not answer the government's rebuttal summation himself. (Court 1) Minutes later, the court rejected counsel's reference to the court in explaining the jury's role as factfinder and, immediately thereafter, counsel's statement about the materiality of the trial's result to the government. (C2 & C3)

The fourth interruption was a needless remark by the court, as was the following one, that the court would charge that motive was immaterial. (C4 and C5)

Fifteen minutes later, the court interrupted to observe that there was no evidence concerning the admiration of the entire community for Matanic. The promised coffee then arrived, and a brief recess was taken. (C6)

Bergman had barely resumed after the recess when the court challenged his suggestion that Zvonko Busic had instilled a sense of guilt in Matanic. Bergman properly defended this suggestion as an inference from the evidence. The court retorted, "There's no evidence to justify that argument." (C7)

Lloyd Paul Stryker, The Art of Advocacy, 111 (1954).

**17.** The government's motion to strike the briefs of Julienne Busic and Petar Matanic is denied.

Two minutes later, the court bluntly told Bergman that, except for one meeting, there was nothing specific in the record to support what was actually a proper extrapolation of the evidence regarding Zvonko Busic's pre-hijack conversations with Matanic. In reply, Bergman reminded the jury that they could have portions of the record reread. (C8)

Having witnessed the court's failure to observe its own injunction against interruption, Schlam too began breaking in, first objecting to counsel's statement that the defense had kept no secrets. (Government 1) The court reinforced his move:

"Yes, the objection is well taken. The inference is that there's something up their sleeve. No, Mr. Bergman, keep within the bounds of propriety." (C9)

A few minutes later Schlam unnecessarily objected to Bergman's characterization of his tactics on cross-examination—the very kind of characterization Schlam himself had uninterruptedly employed many times during his lengthy argument. (G2)

Shortly thereafter Schlam cut off an argument Bergman was about to make, and the court directed Bergman to state it another way. (G3, C10)

Ten minutes later, a similar interlude was provided by Schlam and supported by the court, when Bergman merely said that Schlam recognized certain evidence as "crucial." (G4, C11)

Ten minutes later, after asking how much longer Bergman was going to take and telling him to take less, the court again broke in to challenge Bergman's statement that Carey had testified that Matanic had had no say in what went on in the plane. This time Bergman tried to salvage the situation by reminding the jury that their recollection controlled. (C12, C13)

The court next asked, "What?", apparently not understanding what Bergman said. (C14)

One minute later, the court broke in to ask counsel whether his statement was not "pure speculation," which Bergman denied. Bergman properly took exception to this interruption. (C15)

When Bergman then attempted to argue that Matanic's presence on the plane was necessary to protect the passengers, the court interrupted to say that there was no evidence to support this assertion. (C16)

Then minutes later, the court again expressed concern about the length of the argument and denied counsel's request for a break. (C17)

Shortly thereafter, Schlam objected to Bergman's statement about the government's reliance on a certain witness to prove venue, which objection the court found "well sustained." (G5, C18)

The court next interrupted Bergman's recital of evidence to ask "Who said that?" (C19) Immediately thereafter, Schlam interjected, "I didn't say that," echoed by the court's "No," in response to Bergman's articulation of Schlam's main theme in the case. There followed a needless colloquy to which the court, Schlam and Bergman all contributed. (G6, C20)

Minutes later, the court again asked counsel if he could shorten his argument. (C21)

One minute later, Schlam interrupted to challenge Bergman's suggestion that the government could have provided proof to support its claim that the defendants might have conferred in jail. The court then interrupted to say that there was no testimony that the defendants had been segregated, which somewhat missed the point. (G7, C22)

Three minutes later, when Bergman mentioned state prosecutor Tannenbaum, with whom Matanic had spoken after his arrest, the court interrupted to say:

"Tannenbaum is not in the federal system, is not a representative of the United States Attorney's Office.

"Is this made clear, Mr. Bergman?"

The thrust of this unnecessary comment was to suggest that counsel was attempting to mislead the jury, when this was clearly not so. (C23)

Immediately thereafter, Bergman said that the government could have obtained copies of defendants' statements to state authorities. This extraordinary exchange followed:

"The Court: I guess you could, too.

"Mr. Schlam: I object to that.

"The Court: You could, too.

"Mr. Bergman: Your Honor, I respectfully except for reasons which I'll make known later on at the side bar.

"The Court: No, no, the defendant doesn't have to come forward with any proof whatsoever. That's what Mr. Bergman is testifying to. When he's charging Mr. Schlam with a great omission, then I think it's proper to bring out the fact that he, too, could have gotten an interview if he wanted a copy of it.

"Mr. Bergman: I respectfully except. I don't think it would be proper for me to make any comments.

"The Court: No, you will not, but proceed."

(G8, C24)

Schlam interrupted Bergman's next point, which stressed that Agent Strand's testimony could only be from memory, a perfectly proper argument. Again the court saw fit to join in the interruption. When Bergman proceeded with his argument, Schlam again stopped him and the court added, "Anyway, it's immaterial." All told, the ensuing colloquy consumed enough time to take up two pages of the minutes before Bergman could restate his argument and proceed. This colloquy included another request by the court that Schlam restrain himself. (G9 & 10, C25 & 26)

When Bergman soon thereafter made the statement that the jury was being asked to decide the case as if it were being tried 200 years ago, Schlam objected. The court added "That's objectionable" and asked the jury to disregard it. (G11, C27)

Bergman then pointed out that the court had interrupted a government's agent's testimony to clear up ambiguity in that testimony. Schlam again intervened. The minutes then record more than three pages of

fruitless discussion on the point as Bergman made two attempts to continue his statement only to be halted once by the court and once more by Schlam. (G12 & 13, C28 & 29)

Within two minutes, the court spoke out again to ask whether an F.B.I. report referred to by Bergman was in evidence. Bergman simply said, "Yes." (C30)

A few minutes later the court again cut in to ask how much longer Bergman would take. Bergman never finished his sentence. When he went on to another subject, the court broke in to note that he had already taken two hours. (C31 & 32)

Two sentences later, when Bergman mentioned Pesut, the court interrupted him once again:

"The Court: Wait a minute, this strikes me as rather unusual. You repeat Petar Matanic. Now, what is the message related to your defense—"

Bergman briefly developed his point regarding the agent who interviewed Pesut when the court again broke in to inquire whether Pesut's counsel had any objection. Although Rochman said he had no objection, the court observed that Bergman was "probably intruding on Mr. Rochman's grounds." (C33 & 34)

One minute later Schlam responded to Bergman's statement that Pesut had told Agent Derdak everything, saying that there was no evidence to support that assertion. The court fully agreed, repeating Schlam's very words, and asked Bergman why he did not defend his own client. Schlam then asked permission to leave the courtroom for two minutes and left. (G14 & 15, C35)

Shortly thereafter, counsel for Zvonko Busic requested a sidebar discussion. Afterwards, the court declared a five minute recess, observing that it was 8:55 P. M. and asking Bergman to see if he could shorten his summation. After the recess, the court asked Bergman to proceed even though Schlam was still absent.

Bergman argued that what Matanic had told Agent Davidheiser had not been a con-

fession, for if it had been, he would not have been concerned about a lawyer in a subsequent conversation with Agent Strand. The court interjected, "It's all over as far as Strand—." Bergman tried to recoup, responding "Somebody who confesses to the crime doesn't ask for a lawyer after he confessed—." Schlam then joined the fray, asking, "What's the evidence to justify that statement?" The court responded:

> "None, and it's confusing to the jury. Let me make this plain to the jury what happened here. We are going to straighten things out."

The court proceeded to give its assertedly definitive version of the facts surrounding the statements taken from Matanic. To this argumentative and wholly unnecessary resumé by the court, Bergman objected. The court rejoined, "You cannot make statements which leave that confusion and ambiguity up in the air." (G16, C36 & 37 & 38)

Within two minutes, Schlam precipitated another three-party discussion by objecting to Bergman's statement that Agent Davidheiser knew "nine times out of ten" that a jury would believe his testimony against a defendant. Schlam grounded his objection on Bergman's lack of statistical evidence. The court said, "Sustained." When Bergman resumed by saying, "He knows as well as Petar Matanic may know, whatever the percentages may be," a needless Schlam objection followed and was buttressed by the court:

> "Mr. Bergman, I hate to interrupt and stop you, but unless you contain your summation within the bounds of propriety I will stop you."

Bergman "respectfully except[ed]." (G17 & 18, C39 & 40)

The court then interrupted to say it would give Bergman "ten minutes more at the most because this seems to be endless." (C41)

Within minutes, Schlam objected when Bergman said, "Ladies and gentlemen, when this case is over, [the judge] will go on to another case." The court asked what this had to do with summation of evidence. (G19, C42) When Bergman resumed, after observing that this was his "closing" and the court's retorting "I don't care what it is; it's still irrelevant," he pointed out that once the jury rendered its verdict there could be "no second thoughts." (C43) To this routine and relevant observation, Schlam objected, and the court followed up, saying:

> "Of course they know all that. They're not going to be intimidated. Go ahead." (G20, C44)

Bergman then ended his summation. When the jury had left the courtroom he stated his "strong exception" and moved for a mistrial "on the basis of the comments made by the Court, by Mr. Schlam during the course of my summation. I think on the whole it constituted improper infringement—." After some exchange about the propriety of certain of Bergman's arguments, the court denied the mistrial motion.

Pesut's counsel also moved for a mistrial based on the disparate treatment the court gave the defendant and the government.

Court adjourned at 9:30 P. M.

FEINBERG, Circuit Judge (concurring in part):

██ I concur in so much of Judge Lumbard's thorough opinion as affirms the convictions of Zvonko and Julienne Busic,[1] and denies the Government's cross-appeal concerning Julienne's sentence. I am unable to concur in Judge Lumbard's conclusion that judicial and prosecutorial interruptions of the summations on behalf of Petar Matanic and Frane Pesut constitute reversible error.

---

1. I agree with Judge Lumbard that Julienne Busic, whom the authorities had reasonable cause to believe was a hijacker, had no constitutionally protected expectation of privacy regarding her bag, which was left behind at the scene of the crime. I therefore find it unnecessary to determine whether there was consent to the search or whether the seizure of the bag by foreign officials acting in their own country insulated the later search by federal agents from the warrant requirements of the Fourth Amendment.

While some, if not many, of the trial court's comments could have been either reserved until defense counsel completed their summations or omitted altogether, I do not believe that the district judge clearly abused his discretion in controlling the summations involved in this case. Moreover, given the context in which the interruptions occurred—during the lengthy summations of eminently qualified counsel following a six-week trial at which appellants' guilt was overwhelmingly established—such interruptions did not deny appellants either effective assistance of counsel or a fair trial. Since Judge Timbers joins me on this point, all of the convictions are affirmed.

As pointed out by Judge Lumbard, the prosecutor made his summation virtually without interruption; defense counsel reserved their many objections and comments until the Government's summation was completed. It is unfortunate that the Government did not accord the defendants the same courtesy during their summations. Furthermore, it must be acknowledged at the outset that the trial judge intervened in the summations of defense counsel with some frequency after not doing so with the prosecutor. Nonetheless, a thorough reading of the summations leaves us with the firm conclusion that defendants were not denied a fair trial or the effective assistance of counsel.

Pesut's counsel, Mr. Rochman, spoke for approximately two hours, sporadically interrupted by the court on 18 occasions. Two thirds of those interruptions occurred during the last third of the summation and several involved the court's clearly justifiable concern with either the length of sum-

mations or an inability to understand counsel. In light of the five and one-half hours allotted to the Government to sum up with respect to four defendants, it surely was not unreasonable to attempt to limit the summation of each defendant to two hours. On three other occasions, the court seemingly corrected counsel's innocent misstatement of the law, and two of these times Rochman apologized to the court. Unlike Judge Lumbard, we consider such interruptions to be justified. Moreover, none of the interruptions could be classified as lengthy since the total of the court's remarks constituted less than five pages out of Rochman's 90-page summation.[2] Nor were the exchanges acerbic.[3] Finally, and most importantly, none of the interjections clearly prejudiced appellant by indicating the judge's disbelief in the defendant's version of the hijacking or by appreciably impeding the fluid and persuasive flow of Rochman's summation.[4]

Mr. Bergman's summation on behalf of Matanic followed the Rochman summation. As the evening advanced, the atmosphere became less than placid, and some of the turbulence was undoubtedly due to Bergman. Thus, the following colloquy occurred when Bergman attempted to drive home to the jury their preeminent right to decide the question of guilt or innocence:

Mr. Bergman: Your decision is supreme. You are like the ancient kings. And nobody, not Judge Bartels—

The Court: Just leave me out of this. I am not—

Mr. Bergman: I will bring in the President of the United States . . ..

---

**2.** Indeed, the longest commentary by the judge was a reminder to Schlam, the prosecutor, to refrain from objecting until the defendants had concluded their closing arguments.

**3.** As already indicated, see note 2 supra, the district judge warned Schlam, albeit seemingly without effect, to refrain from objecting. Several other times, the trial court merely asked for clarification of whether there was a factual basis for counsel's argument. Counsel was able to quickly assure the court of the accuracy of the details presented to the jury and continue on with his argument, and on one such

occasion the trial judge apologized for his interruption.

**4.** That the jury, which convicted the Busics on all counts, acquitted Matanic and Pesut of the charge involving air piracy resulting in death is perhaps indicative of the persuasiveness of both Rochman and Bergman, and also undermines appellants' claim that the jury was prejudiced against them because of the trial judge's actions during the trial generally and the summation specifically.

Similarly, the following exchange took place as counsel for the appellants pressed the court to grant a motion:

> Mr. Rochman: My motion—
> Mr. Bergman: Your Honor,—
> The Court: No.
> Mr. Bergman: Yes, yes, yes.

These examples indicate that Bergman was at least partially to blame for whatever curtness the trial court may have exhibited toward him at this point in the proceeding.

This is not to say that we believe that the trial court so forsook its role of impartial tribunal or so interfered with Bergman's clearly effective summation as to require reversal. Careful analysis of the record reflects that at least ten of the forty-odd interruptions of Bergman's three-hour summation were appropriate technical queries by the court as to what had been said, which defendant Bergman was representing, or how much longer Bergman intended to speak. Also clearly justified were eight other interruptions necessitated by Bergman's improper attribution of statements or actions to the Government.[5] Similarly, in several other instances, the trial court properly corrected or clarified Bergman's summation as regards the evidence adduced at trial.[6] The majority of the remaining interruptions were perhaps unnecessary but clearly harmless objections to defense counsel's rhetorical excesses. As with Rochman,

Bergman continued his summation without hesitation despite relatively numerous interruptions, and on several occasions he even capitalized on the court's intervention.

Since we agree with Judge Lumbard that appellants' other challenges to the trial court's conduct have no merit, the narrow issue before us is whether the summations described in detail above were so hindered by the trial court's interruptions as to have abridged appellants' constitutional rights. We are cited to no case, and we have been unable to locate any, in which a trial court's supervision of summations has alone been held to constitute a denial of effective assistance of counsel. The Supreme Court's decision in *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), is not on point since that case involved a state statute which allowed the trial judge to eliminate summations completely in non-jury cases. Indeed, we think that *Herring* supports our conclusion here since the Court specifically emphasized the broad discretion to be accorded the trial court's control over closing arguments. *Id.* at 862, 95 S.Ct. 2550.[7] We do not say that a district court could never violate a defendant's Sixth Amendment rights by effectively denying him a summation through an excessive series of patently unwarranted interruptions of his closing argument. But this was hardly the case here. Pesut's and Matanic's

---

5. Once, Bergman misleadingly purported to state the Government's reliance on a particular witness and twice he understated the importance of this case to the Government. Two other interruptions cut off Bergman's baseless attempts to suggest that the Government had withheld evidence from the jury. The last three interruptions in this category were prompted by Bergman's improper characterization of Schlam's statements at trial.

6. It is arguable that the district court on a few occasions incorrectly challenged the evidentiary basis of counsel's argument. However, Bergman was usually able to quickly reformulate his statement and proceed with his argument. Moreover, subsequent to Bergman's argument, the judge specifically instructed the jury on at least two occasions that certain of his interruptions were unjustified and that counsel had been correct in his assertions. See, e. g., note 8 infra.

7. The other ineffective assistance of counsel cases cited by Judge Lumbard are also distinguishable. Thus, the trial court in *United States v. Sawyer*, 143 U.S.App.D.C. 297, 443 F.2d 712 (1971), erred by precluding defense counsel from making an undisputed legal point essential to the defense in his closing argument. However, this erroneous supervision of the summation, which was clearly far more prejudicial than any of the interruptions here, was held to be harmless error. Similarly inapposite are *Matthews v. United States*, 145 U.S.App. D.C. 323, 449 F.2d 985 (1971); *United States v. Hammonds*, 138 U.S.App.D.C. 166, 425 F.2d 597 (1970); and *Johns v. Smyth*, 176 F.Supp. 949 (E.D.Va.1959), since those decisions concerned the completely inadequate performance of counsel at trial including the failure to give a closing argument altogether or the rendering of such perfunctory and apologetic summations as to have grossly prejudiced their clients.

counsel gave two- and three-hour summations respectively, albeit intermittently interrupted by the district judge. As demonstrated above, such interjections were often well-warranted, and were individually and cumulatively harmless, especially considering the supplemental instructions given by the court the morning after Bergman's summation.[8]

Similarly, we are convinced that appellants received a fair trial. Appellants were unquestionably able to present a full defense during this fiercely litigated six-week trial. While we would not hesitate to overturn a conviction based upon a trial in which the district judge had exhibited partisanship, see *United States v. Fernandez*, 480 F.2d 726, 735–38 (2d Cir. 1973), we do not think that this occurred here. The trial judge understandably grew somewhat irritable as the long day of summations progressed. While we do not condone such behavior, there is no indication that appellants, who were convicted on overwhelming evidence, were substantially prejudiced. Indeed, as we previously noted, the jury acquitted appellants Matanic and Pesut on

the most serious count. Moreover, whatever negative impression might arguably have been conveyed to the jurors by the court's questions and comments during summation was certainly erased by the court's subsequent comments to the jury. See note 8 *supra*. Given all of these circumstances and viewing the trial from "cover to cover," see *United States v. Sclafani*, 487 F.2d 245, 256 (2d Cir.), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 445, 38 L.Ed.2d 314 (1973), we find no reversible error.

**TIMBERS**, Circuit Judge, concurring in Judge Feinberg's opinion in its entirety, concurring in Judge Lumbard's opinion in part, and disassociating himself from Judge Lumbard's dissenting opinion with respect to the convictions of skyjackers Matanic and Pesut:

Terrorism, both domestic and international, is one of the gravest problems of our day. The skyjacking here involved was a heinous example of such terrorism. It resulted in the death of a New York City police officer and the maiming of other

---

**8.** After telling counsel that, "9:30, I think, without dinner was too much. I don't think we ought to repeat that performance," the court instructed the jury as follows:

> Ladies and Gentlemen, last night I interrupted Mr. Bergman several times in his summation. As you know, a summation is a review of the evidence and arguments that may be made upon the evidence. If there is no evidence to support the arguments, of course, then they are improper.
>
> I made the interruption because, according to my recollections, some of these arguments had no basis in the evidence, but it was my recollection that I was acting upon and I could be wrong. It's your recollection of the evidence that counts, not mine. You're going to decide the facts, not I. I want to make that clear so that the interruptions would be understood.
>
> I checked this morning and I found one of my interruptions was not justified. You recall that Mr. Bergman stated, I think, and as an argument that Mr. Matanic was really on the plane, his actions on the plane were for protection of the passengers. There was some evidence that he felt that he was coerced and that there would be disaster if he didn't follow Zvonko Busic's orders. From there on he made that argument.

> There was evidence, some evidence, to support that argument. It's up to you to accept argument and give it such consideration as you feel proper or reject it, but the interruption was unjustified. That's because my recollection was faulty and that brings us back to the point about the principle that your recollection is going to count, not mine.
>
> The transcript is not up. I will look at it before we close today and see if I made some other errors, but one must remember the purpose of summation and also the fact that any of those interruptions must not be considered as any reprimand of Mr. Bergman because it's the duty of the defense counsel to argue as strenuously as he can for his client, and sometimes, he, too, makes a mistake in that he thinks there's evidence to support his arguments.
>
> The real point is that the result of this is predicated on whether Petar Matanic had any intent in hijacking the plane and predicated upon that basis—of course, if he did not have intent to hijack the plane, then, of course, that must be an acquittal, but that depends upon the evidence, again, which is your recollection of the evidence and not the Court's recollection of the evidence. I simply want to clarify that so we understand the reason for the interruptions and the real issue involved.

police officers. The lives of eighty-five passengers and seven members of the crew of the TWA plane were placed in jeopardy during the twenty-seven hour skyjacking which terminated when the plane, which took off from New York for Chicago and was not intended for trans-ocean flights, was forced by the skyjackers to fly across the Atlantic and to land at Paris, after refueling stops at Montreal, Newfoundland, Iceland and London.

Congress could hardly have been more emphatic in its recognition of the severity of precisely the offense here involved when it provided for the imposition of a mandatory sentence of death or life imprisonment —nothing less—upon anyone convicted of the offense of aircraft piracy resulting in the death of another person. 49 U.S.C. § 1472(i)(1)(B) (Supp. V 1975).

I join in today's judgment which affirms the convictions and sentences of all appellants on all counts.

I concur in the entirety of Judge Feinberg's opinion affirming the convictions and sentences of appellants Pesut and Matanic.

To the extent that Judge Lumbard's opinion affirms the convictions and sentences of appellants Zvonko Busic and Julienne Busic, I concur.

■ To the extent, however, that Judge Lumbard's opinion constitutes a dissenting opinion with respect to the convictions of appellants Pesut and Matanic,[1] I not only concur in Judge Feinberg's majority opinion affirming their convictions; I respectfully but emphatically disassociate myself from the entirety of Judge Lumbard's dissenting

opinion for the following reasons, briefly summarized:

(1) The dissent has ignored the context in which the interruptions occurred— during several hours of summations at the conclusion of a protracted six week trial in the course of which overwhelming evidence of the guilt of these appellants was adduced. The interruptions in large measure were triggered by provocative conduct on the part of defense counsel. The conscientious, experienced trial judge,[2] exercising the broad discretion which we uniformly have accorded to trial judges in the control of summations, acted with the utmost fairness and impartiality in handling defense counsel who repeatedly had demonstrated throughout the trial a propensity for inflammatory statements and prejudicial conduct in the presence of the jury. And—of critical significance here— no prejudice to Pesut or Matanic has been shown; indeed, the jury's acquittal of them on the count which carried a mandatory penalty of death or life imprisonment, while convicting the two Busics on that count, strongly suggests that the jury was not prejudiced against Pesut or Matanic.

(2) The dissent, in concluding that the convictions of Pesut and Matanic should be reversed on the grounds that they were deprived of the effective assistance of counsel guaranteed them by the Sixth Amendment and that they were deprived of a fair

1. Judge Lumbard's dissenting opinion begins where he states, "Judge Lumbard dissents." *Ante* at 27. It embraces his text, *ante* at 27–31; his footnotes, *ante* at 27–31; and his Appendix, *ante* at 31–34.

2. Judge Lumbard's partial majority—partial dissenting opinion fails to disclose, either in the headnote or in the text, the identity of the trial judge. I had thought such disclosure was a practice uniformly followed by our Court for many years.

 In any event, I regard it important to know, in view of the grounds urged by the dissent for the reversal of the convictions of Pesut and

Matanic, that the trial judge was Honorable John R. Bartels, Senior United States District Judge for the Eastern District of New York. He has served with distinction as a federal trial judge for nearly two decades, preceded by service as a justice of the Supreme Court of the State of New York. He has been a member of the bar for more than half a century. He had extensive trial experience as a member of the bar. I take it to be common ground that Judge Bartels is generally regarded as one of the most conscientious and experienced federal trial judges in the United States.

trial solely because of interruptions during their counsel's summations, has reached a conclusion contrary to the applicable law, as indicated by the following:

(a) The dissent's conclusion is wholly unprecedented.

No court has ever held that a criminal conviction should be reversed *solely* because of interruptions by the court or prosecutor during summations by defense counsel.

(b) No such claim is made by counsel for these appellants.

Their claim, set forth in their brief on appeal, is that the trial judge's bias and hostility permeated the trial "from start to finish", of which the summations were but one facet. Appellants' claims of an unfair trial in all other respects having been unanimously rejected, there remains only the asserted error limited to the conduct of the summations—an error which counsel have not claimed since there is no authority for it.

(c) The denial of effective assistance of counsel ground for reversal urged by the dissent, aside from being wholly without precedent, is at best a curious anomaly in view of the record in this case. Whatever else may be said of defense counsel's conduct during their summations, it most assuredly did not constitute—under the stringent standard of this Circuit or under any standard—a denial of effective assistance of counsel. In short, this simply is not a right-to-counsel case.

(d) The denial of a fair trial ground for reversal urged by the dissent, limited *solely* to the interruptions during defense counsel's summations, ignores not only the record as a whole in this case, but the settled law that under the broad discretion conferred on the trial judge to control the summations, an appellate court will not set aside a conviction on that ground absent the clearest showing of abuse of discretion, and no appellate court has ever done so.

For these reasons, I concur in the entirety of Judge Feinberg's succinct majority opinion with respect to the convictions of appellants Pesut and Matanic; and I regret that I must respectfully but emphatically disassociate myself from Judge Lumbard's dissenting opinion with respect to these appellants.

I agree with the majority judgment which affirms the convictions and sentences of all appellants on all counts.